Sydell R. KRAFT, Levin International Corporation, Trans Atlantic Games of Nevada, Inc., and Trans Atlantic Games, Inc., Plaintiffs/Appellants,

v.

S. Barton JACKA, Michael D. Rumbolz, Guy T. Hiller, and Larry G. Hickman, Defendants/Appellees.

No. 87–2804.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 15, 1988.

Decided April 12, 1989.

Martin J. Kravitz, Brown, Wells & Kravitz, Las Vegas, Nev., for plaintiffs/appellants.

Brian McKay, Atty. Gen., and Dan R. Reaser, Chief Deputy Atty. Gen., Las Vegas, Nev., for defendants/appellees.

Before CHOY, CANBY and TROTT, Circuit Judges.

CHOY, Circuit Judge:

Sydell R. Kraft ("Kraft"), Levin International Corporation ("LIC"), Trans Atlantic Games, Inc. ("TAG"), and Trans Atlantic Games of Nevada ("TAG–Nevada") (collectively referred to as "plaintiffs") appeal from the district court's grant of summary judgment in their action under 42 U.S.C. § 1983 against members of the Nevada Gaming Board ("Board" or "Board members"). This action arose from the Board's refusal to extend further licensing to the plaintiffs after expiration of their one-year limited gaming licenses.

The district court concluded that the Board members were protected by absolute immunity. Alternatively, the district court ruled that the Board members were entitled to qualified immunity because plaintiffs had not shown that the Board violated clearly established constitutional rights of which a reasonable person would have

known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In part, this ruling was based on the court's determination that plaintiffs had no protected property or liberty interest and thus could not make out a claim for violation of due process rights.

Without reaching the issue of immunity, we affirm and hold that the plaintiffs have failed to establish a violation of procedural due process. Plaintiffs had no protected property interest in further licensing and could show no other property or liberty interest that would trigger due process protection. In addition, we hold that plaintiff Kraft has failed to establish a violation of her fourteenth amendment right to freedom of intimate association.

## BACKGROUND

In 1984, plaintiffs applied to the Board for licenses to manufacture, distribute, and operate gaming devices in Nevada. The Board considered the applications at a public meeting on February 13, 1985. At that meeting, Board members raised several concerns regarding matters uncovered during the investigation of plaintiffs. Specifically, the Board was concerned that plaintiffs had engaged in the sale and distribution of slot machines within Nevada without a license, had shipped a machine into the state which had been approved in a particular form but had been modified without approval, and apparently had difficulty maintaining control of their machines in Nevada. The Board also was concerned that Howard Levin ("Levin"), who was then president of all the plaintiff corporations, had been associating with a convicted felon.

The Board ultimately voted to recommend approval of one-year limited licenses. The Board advised plaintiffs that its action was merely a recommendation to the Nevada Gaming Commission ("Commission"), which would make the final decision.

The Commission considered the recommendation at a public meeting on February 21, 1984. After raising several of the same concerns expressed by the Board, the Commission voted three to two to issue licenses in accordance with the Board's recommendation. Each license stated that it was a "[l]imited license to expire on date of Nevada Gaming Commission meeting of February, 1986." The Commission's orders of registration of LIC and TAG also stated that the sale of any equity in LIC or TAG:

shall be void unless approved in advance by the ... Board. Such approval is deemed granted if an application ... has been filed with the Board for 30 days and the Board has not ... ordered acceleration or extension of time, or issued a stop order during such period.

In October, 1985, LIC filed a preliminary prospectus with the SEC in connection with a proposed public offering. On November 20, 1985, the Board issued an order stopping the offering. Two days later, the Board rescinded the order.

Plaintiffs and Levin subsequently applied for licenses to become effective at the end of the one-year period. The Board considered these applications at a meeting on February 6, 1986. Kraft and Levin attended the meeting. The Board members again raised numerous concerns, including Levin's substantial gambling debts and the possibility that he had used subterfuge to avoid repayment of those debts. Prior to any decision of the Board, plaintiffs requested withdrawal of the LIC and TAG applications and a continuance of the Board's consideration of the TAG–Nevada application. This continuance allowed LIC, TAG, and Levin time to transfer their interests to Kraft so that only Kraft and TAG–Nevada would be under consideration.

One week later, the Board considered the revised applications at a public meeting. The Board expressed concerns about the financial strength of TAG–Nevada, the continued involvement of Levin, and the genuineness of the separation of Levin from Kraft and TAG–Nevada. The Board ultimately voted unanimously to recommend denial of the applications "without prejudice," meaning that the applicants could attempt to cure the deficiencies in their applications and reapply.

On February 20, 1986 (one week later), the Commission considered the Board recommendation at a public meeting. Kraft attended the meeting with her attorney. The Commission echoed the concerns of the Board, and voted four to one against approval of either permanent licenses or six-month limited licenses.

The one-year licenses expired on February 21, 1986. On March 7, 1986, Board Chairman Jacka wrote to all Nevada licensees and their affiliates to notify them of the denial of new licenses to plaintiffs, quoting provisions of Nevada law requiring Commission approval prior to engaging in business transactions with denied applicants.

On July 18, 1986, plaintiffs filed their complaint in district court against S. Barton Jacka, Michael D. Rumbolz, and Guy T. Hillyer, members of the Board, and Larry G. Hickman, an employee of the Board. The complaint included two claims for relief under RICO, a claim based on common law fraud, and a request for injunctive relief. The complaint also included two claims under 42 U.S.C. §§ 1983, 1985, and 1986. The plaintiffs alleged their civil rights had been violated because they had been deprived of protected property and liberty interests without due process of law.

The Board moved for summary judgment on October 3, 1986. On August 31, 1987, the district court held a hearing on the motion. On September 4, 1987, the court issued its opinion granting the motion for summary judgment. *Kraft v. Jacka*, 669 F.Supp. 333 (D.Nev.1987). The district court concluded that the Board members were entitled to absolute immunity. Alternatively, the court held that the Board members were entitled to qualified immunity on the civil rights claims. The court

determined that there was no procedural due process violation because plaintiffs could not show a protected property interest in further licensing after the limited licenses expired automatically in February, 1986. *Id.* at 337–39. The court further determined that the Board was not the actual or proximate cause of the injuries stemming from the refusal to license, since the Board only made recommendations and the Commission was responsible for the ultimate decision to license.[1] *Id.* at 339.

On appeal, plaintiffs attack a variety of the findings and conclusions of the district court with respect to their action under 42 U.S.C. § 1983.[2] The plaintiffs contend that the district court erred by failing to view factual disputes in a manner most favorable to them as opponents of a summary judgment motion. Further, they contend that they were denied their procedural due process rights in the licensing proceedings and that the district court erred by failing to find protected property or liberty interests that would entitle them to due process of law. Plaintiff Kraft contends that the Board violated her right to free association by denying her application for a license because she would not terminate her personal relationship with Levin. Finally, the plaintiffs contend that the district court erred in determining that the Board was immune from suit.

## STANDARD OF REVIEW

We review *de novo* a grant of summary judgment, using the same standard that is used by the trial court. *Bonner v. Lewis*, 857 F.2d 559, 561 (9th Cir.1988). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the party opposing the motion, the court finds that there is no genuine issue of material fact and the moving party is entitled to

---

1. The district court noted that the plaintiffs had voluntarily withdrawn their claims under RICO. 669 F.Supp. at 337. The court dismissed the plaintiffs' 42 U.S.C. § 1985 claim because plaintiffs failed to allege class-based animus. The court denied the request for injunctive relief. Finally, having granted summary judgment on the federal claims, the court noted that its pendent jurisdiction over the state fraud claim was lost. *Id.* at 340–41. Plaintiffs do not raise the

§ 1985 claim or the state fraud claim on appeal, nor do they discuss injunctive relief.

2. To proceed under 42 U.S.C. § 1983, plaintiffs must allege deprivation of a constitutionally protected right under color of state law. *Learned v. City of Bellevue*, 860 F.2d 928, 933 (9th Cir.1988).

judgment as a matter of law. Fed.R.Civ.P. 56(c); *Lundy v. Union Carbide Corp.*, 695 F.2d 394, 396 (9th Cir.1982), *cert. denied*, 474 U.S. 848, 106 S.Ct. 143, 88 L.Ed.2d 118 (1985).

## DISCUSSION

### I. *Protected Property or Liberty Interests*

As a threshold requirement to any due process claim, the plaintiffs must show that they have a protected property or liberty interest. *Board of Regents v. Roth*, 408 U.S. 564, 569–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972). The plaintiffs contend they were deprived of two separate property interests: (1) the property interest of TAG–Nevada in its limited licenses, and (2) the property interest of LIC in its common stock. In addition, plaintiffs assert that a protected liberty interest in reputation was violated. Plaintiffs TAG and LIC assert that their interest in reputation was violated by a finding of unsuitability issued by the Board without notice to them. Plaintiffs TAG–Nevada and Kraft contend that their reputations were damaged by the letter the Board sent to all Nevada gaming licensees, informing the licensees that Kraft and TAG–Nevada had been denied further licensing.

### A. *Protected Property Interests*

#### 1. *TAG–Nevada's Property Interest in its Limited Licenses*

■ Plaintiffs contend that TAG–Nevada had a property interest in its limited licenses which was protected by due process. Property rights protected by procedural due process "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Thus, the issue before us is whether state law or any other source confers upon a limited licensee an expectation of entitlement to continued licensing that would give rise to a property interest protected by the federal Constitution. "A reasonable expectation of entitlement is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms." *Association of Orange County Deputy Sheriffs v. Gates*, 716 F.2d 733, 734 (9th Cir.1983), *cert. denied sub nom. Singer v. Gates*, 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984).

■ The district court determined that plaintiffs stood in the shoes of first time applicants as of the date their limited licenses expired.[3] Relying on *Jacobson v. Hannifin*, 627 F.2d 177, 179 (9th Cir.1980), in which we held that a first time applicant has no protected property interest in a new gaming license, the district court concluded that plaintiffs had no constitutional or statutory right to further licensing.

Plaintiffs make two arguments that the district court erred in holding they had no expectation of entitlement to continued licensing. First, plaintiffs assert that they were licensed and in active business at the time their limited licenses were reviewed and thus the refusal to extend any further licensing to them was more a revocation of existing licenses than a denial of new licensing. As holders of existing gaming licenses, they contend that they had a sufficient property interest to warrant procedural due process protection upon revocation of the licenses.[4]

---

**3.** Plaintiffs contend that the district court was required to characterize TAG–Nevada's property interest in the limited licenses in the light most favorable to them, as required by Fed.R.Civ.P. 56(c). This contention is meritless. Fed.R.Civ.P. 56(c) requires only that the *evidence* be construed most favorably to the opponent of a summary judgment motion. The characterization of TAG–Nevada's property interest depends primarily on statutory construction and is thus a question of law which does not need to be construed most favorably to either party. This court reviews questions of law *de novo*. *Brock v. Plumbers Int'l Union of America Local 375*, 860 F.2d 346, 349 (9th Cir.1988).

**4.** Plaintiffs cite *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), and *Kerley Industries, Inc. v. Pima County*, 785 F.2d 1444 (9th Cir.1986), to support their argument that

We need not decide whether there is a state-created property interest in an existing gaming license that would be protected by the federal Constitution. A close look at the statutory scheme governing licensing and the specific purposes behind issuance of a limited license instead of a permanent license reveals that the decision to deny further licensing did not operate as a revocation or suspension of an existing license. Rather, it is clear as a matter of statutory interpretation that plaintiffs stood in the shoes of first time applicants when they appeared before the Board in 1986. As first time applicants, plaintiffs had no protected property interest in further licensing. *Jacobson*, 627 F.2d at 180.

Under the Nevada Gaming Control Act (the "Act"), Nev.Rev.Stat. §§ 463.010 *et seq.*, gaming is regulated primarily through licensing and control by the Commission and the Board. The Board has "full and absolute power and authority to recommend [to the Commission] the denial of any application, the limitation, conditioning, or restriction of any license ... [or] the suspension or revocation of any license ... for any cause deemed reasonable by the board." [5] Nev.Rev.Stat. § 463.1405(2).

The Commission has the same broad authority in making final rulings on licensing applications. *Id.* § 463.1405(3).

In making a licensing decision, the Board and Commission are required to consider numerous factors which indicate whether the applicant is suitable to participate in Nevada gaming.[6] *See* Nev.Rev.Stat. §§ 463.1405, 463.170. The Board has discretion to recommend issuance of a limited license, rather than a permanent license, when there are serious concerns regarding an applicant's suitability. A limited license is issued to allow a licensee to engage in business temporarily, as a testing period. If the concerns regarding suitability are resolved during the term of the limited license, the Board recommends further licensing. If the concerns are not resolved, the Board has discretion to recommend denial of an application for further licensing.

We conclude that the Nevada legislature could not have intended to confer any entitlement to further licensing on licensees who initially had not been considered suitable enough for the Board to recommend issuance of a permanent license. This conclusion is consistent with the sections of

the holder of an existing gaming license would have a property interest in revocation or suspension of that license. In *Barry*, the Supreme Court determined that a harness racing trainer had a property interest in his racing license that was protected by the Due Process Clause against suspension or revocation without proof of culpable conduct. In *Kerley*, the owner of a chemical plant was granted a conditional permit allowing the plant to operate for a limited period of time. The County subsequently revoked the conditional permit without prior notice and a hearing. State law set forth detailed provisions for suspension and revocation of conditional use permits. We concluded that "[t]his body of law endowed appellant with a sufficient claim of entitlement to its conditional use permit ... to establish a property right and to trigger the constitutional requirement of due process." *Id.* at 1446.

5. A gaming license can be restricted or nonrestricted. A restricted license is a license to operate no more than 15 slot machines. All other licenses are nonrestricted. Nev. Gaming Comm'n Reg. 4.030(1); Nev.Rev.Stat. §§ 463.-0177, 463.0189. A nonrestricted license can be limited to a set period of time or conditioned on the performance of certain acts. The licenses possessed by the plaintiffs were nonrestricted, subject to certain conditions, and limited to a period of one year.

6. Nev.Rev.Stat. § 463.170 provides in part:
2. An application to receive a license or be found suitable shall not be granted unless the commission is satisfied that the applicant is:
    (a) A person of good character, honesty and integrity;
    (b) A person whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest of this state or to the effective regulation and control of gaming ...; and
    (c) In all other respects qualified to be licensed or found suitable consistently with the declared policy of the state.
3. A license to operate a gaming establishment shall not be granted unless the appliant has satisfied the commission that:
    (a) He has adequate business probity, competence and experience, in gaming or generally; and
    (b) The proposed financing of the entire operation is:
        (1) Adequate for the nature of the proposed operation; and
        (2) From a suitable source.

the Act that govern renewal and revocation or suspension of permanent licenses. A permanent license must be renewed each year on January 1, but renewal is virtually automatic upon payment of the proper fees and taxes.[7] Nev.Rev.Stat. § 463.270. Presumably, the holder of a permanent license could allow the license to expire by failing to pay the renewal fees. As long as fees are paid, however, the holder has a continuing license unless the Board, upon proper investigation, decides to initiate a hearing before the Commission to limit, condition, suspend, or revoke the license. *See* Nev. Rev.Stat. § 463.310(2).

TAG–Nevada's limited licenses differed from a permanent license in that they were set to expire automatically in February, 1986. During the term of the licenses, the Board presumably would have been required to initiate a hearing before it could revoke or suspend the licenses. However, in the 1986 licensing proceedings, the Board had the option to allow the limited licenses to expire without further action by the Board or to grant TAG–Nevada's request for further licensing. The Board was not required to revoke the limited licenses and TAG–Nevada was not automatically entitled to renewal upon payment of fees. TAG–Nevada's position was indistinguishable from that of any other first time applicant.

Our conclusion that plaintiffs had no entitlement to further licensing also is consistent with our reasoning in *Jacobson*. In *Jacobson*, we determined that the Commission's broad discretion to grant or deny gaming license applications negated a claim to a state-created property interest in a new gaming license. 627 F.2d at 180. We stated:

[t]he specific question before us is whether the Nevada Gaming Control Act provides in Jacobson an expectation of an entitlement to a license sufficient to create a property interest. That will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the Commission to deny licenses to applicants who claim to meet minimum eligibility requirements.

627 F.2d at 179–80 (citations omitted). As was the case in *Jacobson* which dealt with a new applicant, the Nevada legislature has done nothing to restrict the Board's discretion to deny further licensing to a licensee when suitability concerns have not been resolved during the term of a limited license. The limited licenses possessed by plaintiffs were set to expire automatically on the date of the Nevada Gaming Commission meeting of February, 1986. The Board's total discretion to deny further licensing beyond that date once again "negates [plaintiffs'] claim to a protectible property interest created by the State." *Id.* at 180.

The plaintiffs' second argument is that they were assured by the Board that they would be granted continued licensing if they met with certain conditions attached to the limited licenses. They contend that they have invested hundreds of thousands of dollars in their business in reliance on this assurance and that they strictly adhered to the conditions attached to their licenses. Because of their compliance with the conditions, they contend that they had a reasonable expectation of entitlement to further licensing.

This contention is without merit. Assuming that such an assurance by the Board could give rise to an entitlement sufficient to trigger procedural due process protections,[8] there is absolutely no support for the plaintiffs' contention that the prom-

---

7. Nev.Rev.Stat. § 463.270 provides, in part:
   1. Subject to the power of the commission to deny, revoke, suspend, condition or limit licenses, any state license in force may be renewed by the commission for the next succeeding license period upon proper application for renewal and payment of state license fees and taxes as required by law and the regulations of the commission.

2. All state gaming licenses are subject to renewal on the 1st day of each January....

8. A property interest *may* be established through an implied contract or "by some other 'mutually explicit understandings.'" *Parks v. Watson*, 716 F.2d 646, 656 (9th Cir.1983) (quoting *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1971)).

ise was made. The sole basis for plaintiffs' assertion is a statement by one Board member at the first licensing proceeding in 1985 that if, during the term of the one-year license, the Board found no "material problems," the Board "may very well entertain going to the full license." This is hardly an assurance that further licensing would be automatic. There is no other place in the record before the district court where any Board member makes any assurance to the plaintiffs that satisfaction of the conditions would result in automatic permanent licenses. In addition, as the Board and the Commission pointed out in the 1986 proceedings, such an assurance would be contrary to their duty to consider all of the statutory criteria that would indicate the plaintiffs were suitable to operate a gaming establishment.

The transcripts of the Board and Commission hearings, which were part of the record before the district court, contain no assurance of continued licensing. No other evidence of an assurance, other than that dealt with above, was presented. Thus, there was no issue of material fact on this point and the plaintiffs cannot establish an entitlement to further licensing on the basis of the Board's alleged promise. Since plaintiffs stood in the shoes of first time applicants in the 1986 licensing proceedings and have not established an entitlement to permanent licensing on any other ground, plaintiffs had no protected property interest in further licensing.

### 2. *LIC's Property Interest in its Common Stock*

Plaintiffs next argue that the Board violated their constitutional right by issuing a stop order as to an out-of-state sale of corporate securities by LIC. They contend that the Board's action deprived them of corporate property in violation of the Commerce Clause, and thus in violation of 42 U.S.C. § 1983.

■ The Commerce Clause places restraints upon the power of the states. *Philadelphia v. New Jersey*, 437 U.S. 617, 623, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). It divides power between the states

and the federal government. We have previously stated that "§ 1983 was not intended to encompass those constitutional provisions which allocate power between the state and federal government." *White Mountain Apache Tribe v. Williams*, 810 F.2d 844, 848 (9th Cir.1984) (Supremacy Clause, which establishes federal-state priorities, does not secure individual rights under § 1983), *cert. denied*, 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987); *see also Consolidated Freightways Corp. v. Kassel*, 730 F.2d 1139, 1144 (8th Cir.1984) (The Commerce Clause is "an allocating provision, not one that secures rights cognizable under § 1983."), *cert. denied*, 469 U.S. 834, 105 S.Ct. 126, 83 L.Ed.2d 68 (1984). Thus, assuming that the Board's actions in any way implicated the Commerce Clause, the plaintiffs cannot state a cause of action under § 1983 for violation of the Clause.

### B. *Liberty Interests in Reputation*

The plaintiffs make two arguments that they were deprived of a protected liberty interest in reputation without due process of law. Plaintiffs TAG and LIC contend that they were deprived of their liberty interest when the Board, without first giving notice to the two companies, issued an order finding them unsuitable to engage in Nevada gaming. In addition, plaintiffs TAG–Nevada and Kraft contend that they were deprived of their liberty interest when the Board sent out a letter to all Nevada licensees informing the licensees that the application of TAG–Nevada and Kraft had been denied.

■ An interest in reputation "is, without more, 'neither "liberty" nor "property" guaranteed against state deprivation without due process of law.'" *Fleming v. Department of Public Safety*, 837 F.2d 401, 409 (9th Cir.1988) (quoting *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976)), *cert. denied*, —— U.S. ——, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988). To implicate constitutional liberty interests, state action must be "sufficiently serious to 'stigmatize' or otherwise burden the individual so that he is not able to take advan-

tage of other ... opportunities." *Bollow v. Federal Reserve Bank of San Francisco,* 650 F.2d 1093, 1101 (9th Cir.1981) (citing *Board of Regents v. Roth,* 408 U.S. at 573–74, 92 S.Ct. at 2707), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982). The statements at issue must involve charges which rise to the level of "moral turpitude"; "charges that do not reach this level of severity do not infringe constitutional liberty interests." *Id.*

1. *Liberty Interests of TAG and LIC*

■ At the February 13, 1986, meeting, the Board voiced concerns regarding Kraft's and TAG–Nevada's continued involvement with LIC, TAG, and Levin. The Board issued an order recommending to the Commission that TAG–Nevada's application be denied. That order stated that one reason for recommending denial was that Kraft had proposed to continue her business association with TAG, LIC, and Levin, "all of whom are found to be unsuitable by the Board." Neither TAG nor LIC was represented at the February 13 meeting because both companies had withdrawn their license applications. Plaintiffs contend that the Board's statement regarding unsuitability "banished" both TAG and LIC from association with gaming in Nevada, and thus stigmatized them sufficiently to impair liberty interests. Since they were not present at the meeting, they contend that this finding of unsuitability violated due process.

Neither TAG nor LIC was directly affected by the Board's statement that they were unsuitable. Because neither company was before the board as an applicant, the statement did not have the effect of a "finding" of unsuitability which would result in denial of a licensing application. The Board was required to consider Kraft's associations, both business and personal, in ruling on TAG–Nevada's licensing application. Nev.Rev.Stat. §§ 463.170(2)(b), (3)(b)(2). The Board's statement constituted only a determination that TAG–Nevada should not be allowed to participate in gaming because the company's president, Kraft, had unsuitable associations. TAG and LIC were not "banished" from Nevada gaming by virtue of the Board's statement. Since the plaintiffs have not shown that the statement had a stigmatizing effect on the companies' ability to pursue future licensing applications, the asserted interest in reputation does not rise to the level of a constitutional liberty interest.

2. *Liberty Interests of TAG–Nevada and Kraft*

■ After the Commission issued its order denying TAG–Nevada's application for further licensing, the Board sent a letter to all Nevada gaming licensees informing them that TAG–Nevada and Kraft were no longer able to conduct business in the gaming industry. The Board's action did not invade a constitutional liberty interest in reputation. "Unpublicized accusations do not infringe constitutional liberty interests because, by definition, they cannot harm 'good name, reputation, honor or integrity.' ... When reasons are not given, inferences drawn from [the state action at issue] are simply insufficient to implicate liberty interests." *Bollow,* 650 F.2d at 1101 (quoting *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976)). The Board's letter did not state any reasons for the denial and did not even say that TAG–Nevada or Kraft had been declared unsuitable. An inference of unsuitability could have been drawn from the denial alone. However, as we stated in *Bollow,* a mere inference is not sufficient to implicate a liberty interest in reputation.

Plaintiffs had no protected property interest in further licensing and could not make out a claim under § 1983 for an alleged violation of the Commerce Clause. In addition, plaintiffs have failed to establish a protected liberty interest in reputation. Since plaintiffs had no protected property or liberty interests, they cannot show that their due process rights were violated. *Roth,* 408 U.S. at 569–71, 92 S.Ct. at 2705–06.

II. *Kraft's Free Association Claim*

Kraft contends that the Board violated her free association rights by basing the

denial of TAG–Nevada's application on her personal association with Levin. Kraft and Levin live together as single adults.

There are two possible sources of constitutional protection for personal relationships. The first amendment protects expressive associations that involve the other activities protected by the amendment such as speaking, religious exercise, and petitioning the government. *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1192 (9th Cir.1988). The fourteenth amendment protects " 'certain intimate human relationships ... against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme.' " *Id.* at 1191 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984)). Kraft contends that the Board's denial of her licensing application violated her fourteenth amendment right to free association, because the Board's denial was based on its disapproval of her personal relationship with Levin.

During the Board's meeting on February 6, 1986, it became obvious that the Board was concerned with Levin's suitability and was prepared to deny his application for licensing. The Board granted plaintiffs a continuance of their applications so that LIC, TAG, and Levin could transfer their interests in TAG–Nevada to Kraft. Kraft purchased TAG–Nevada, in exchange for a promissory note, so that only Kraft and TAG–Nevada would be under consideration.

At the February 13 Board meeting, the Board expressed serious concerns about the financial stability of TAG–Nevada and the possibility that Levin would continue to participate in the management of the company.[9] In the Board's order recommending denial of TAG–Nevada's application, the Board stated as one reason for the recommendation that "the applicant, SYDELL R. KRAFT, has proposed to continue her *business association* with TAG, [LIC], and Howard S. Levin, all of whom are found to be unsuitable by the Board, and this association will create or enhance the danger of unsuitable practices, methods and activities in the carrying on of business and financial arrangements incidental to the conduct of gaming by the applicants...." (emphasis added). Business relationships do not fall within the fourteenth amendment's protection of intimate associations. *IDK, Inc.*, 836 F.2d at 1193. If the Board had denied the application solely on the basis of Kraft's business ties with Levin, there clearly would be no constitutional violation.

However, the transcript of the Board meeting shows that the Board also was concerned that Kraft would continue to have a personal relationship with Levin.[10] In fact, one Board member stated that Kraft "could not have structured this deal to [his] satisfaction ... because the only way [he] would be willing to look at this favorably would be with conditions that Sydell Kraft *not work for nor be associated with* LIC, TAG, Inc., or Howard Levin." (emphasis added). Another Board member stated that "[i]f [he] were to move forward as one Board member today with a recom-

---

**9.** There was some doubt that the company would be able to make enough money to support itself and it seemed more likely that the company would operate at a loss. The Board was concerned that Levin, through TAG and LIC, held the promissory note on TAG–Nevada and would be able to exert some control over the company because of that. Also, there was some discussion about whether Kraft intended to hire Levin as a consultant for mathematical or statistical services and whether he would have any management role in the company. Finally, Kraft stated that she intended to continue working for TAG and LIC in the same position that she had previously held.

**10.** The transcript contains the following testimony:

Member Hillyer: Mrs. Kraft, how about your personal relationship with Mr. Levin? ... Are you still going to be sharing a household?
Ms. Kraft: That is what we are doing today.... We have a very close personal relationship. I hope that it continues, but there are no guarantees....
Member Hillyer: So the personal relationship with Mr. Levin as it stands right now is planned to continue status quo; is that correct?
Ms. Kraft: As far as personal relationship, as far as I know from today, yes.

mendation to approve this transaction, it would be with a condition that [Kraft] sever herself totally from Mr. Levin." Thus, we must decide whether the Board violated Kraft's free association rights when it denied her licensing application.

We have previously stated that the freedom of intimate association is coextensive with the right of privacy. *Fleisher v. City of Signal Hill*, 829 F.2d 1491, 1500 (9th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). As we noted in *Fleisher*, the Supreme Court has extended the right of privacy to unmarried individuals only in cases involving contraception and abortion. *Id.* at 1497. The relationship between Kraft and Levin as cohabitating, single adults may fit within our description of an intimate protected association in *IDK, Inc. v. Clark County*, 836 F.2d at 1193. However, we need not decide whether the relationship between Kraft and Levin is a protected one, because we conclude that the Board's actions did not intrude on Kraft's free association right.

Neither the right to privacy nor the right to free association is absolute. In some cases, these rights must give way to compelling governmental interests. *See Fleisher*, 829 F.2d at 1500 (no violation of free association rights when police officer was terminated for having sexual relationship with a minor); *Fugate v. Phoenix Civil Serv. Bd.*, 791 F.2d 736, 741 (9th Cir.1986) (no violation of right to privacy when police officers were terminated for having sexual relationships with prostitutes); *see also* Karst, *The Freedom of Intimate Association*, 89 Yale L.J. 624, 627 (1980) (freedom of intimate association is presumptive rather than absolute and may give way to overriding governmental interests in particular cases). "The more fundamental the rights on which the state's activities encroach, the more weighty must be the state's interest in pursuing that course of conduct." *Thorne v. City of El Segundo*, 726 F.2d 459, 471 (9th Cir.1983) (citing *Moore v. City of East Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977), and *Kelley v. Johnson*, 425 U.S. 238, 245, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976)).

On the surface, the Board might appear to be violating Kraft's fourteenth amendment right by conditioning receipt of a gaming license on the termination of a possibly protected relationship. However, the Board did not deny licensing because it disapproved of the fact that Levin and Kraft were unmarried. The personal relationship between Kraft and Levin was not even the principal reason for the denial. The Board members clearly indicated that the personal relationship would not have been a deciding factor in the decision to deny further licensing if the transfer of control over TAG–Nevada from Levin to Kraft had not looked so much like a mere subterfuge.[11]

In this case, there was a significant governmental interest that justified the intrusion on any free association right Kraft might have. The Nevada Gaming Control Act sets forth the declared public policy of the state that "[t]he continued growth and success of gaming is dependent upon public confidence and trust that licensed gaming

---

11. The transcript of the February 13 Board meeting contains the following testimony:

> Member Rumbolz: [T]he question of Mr. Levin's relationship with her, frankly, I was prepared to consider under the totality of the circumstances.
> 
> . . . .
> 
> Mr. Silver: Well, I think if in fact you had indicated that Miss Kraft could not be associated with Mr. Levin, knowing that she had this relationship, that it would be an unfair burden on us coming forward, and if we had been told of that fact, probably we would have made other arrangements.

> Member Rumbolz: Mr. Silver, I am talking about right now. As I mentioned to you earlier, I was prepared to look at that relationship after having seen all of the other severances of relationships and her good faith intent to be out here running a company.
> 
> . . . .
> 
> Chairman Jacka: If I were to move forward as one Board member today with a recommendation to approve this transaction, it would be with a condition that she sever herself totally from Mr. Levin. Financially she cannot do that by her own admission today. And then that puts the company in a very tenuous position from a financial perspective.

is conducted honestly and competitively, that the rights of the creditors of licensees are protected and that gaming is free from criminal and corruptive elements." Nev. Rev.Stat. § 463.0129. This public confidence and trust is to be maintained by "strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments and the manufacture or distribution of gambling devices and equipment." *Id.* In considering the qualifications of a licensee, the Board is required to consider whether the licensee's associations will adversely affect the operation of a gaming establishment. Nev.Rev.Stat. § 463.170 (2)(b).[12]

The Board determined that Levin was unsuitable to be associated with Kraft because he lacked the business probity, competence, and experience to be in control of a gaming operation. The Board was concerned that Levin's personal relationship with Kraft would allow him to continue to exercise substantial control over TAG–Nevada.[13] In addition, the Board was concerned that the transfer of TAG–Nevada stock from Levin to Kraft was a mere subterfuge, because the entire transfer was financed through promissory notes,

Kraft's personal relationship with Levin remained unchanged, and Kraft intended to continue working for TAG and LIC in the same position she had previously held.[14]

The state of Nevada has a significant interest in ensuring that only suitable individuals will have control of gaming operations. Here, the Board was concerned that Kraft's personal relationship with Levin would allow Levin to exert indirect control over TAG–Nevada even though he was not considered suitable to hold a gaming license. This concern is directly related to the state's interest in maintaining public trust and confidence in the gaming industry. The denial of Kraft's application was based in part on her refusal to sever her personal ties with Levin. However, the Board's action was not directed at the personal aspects of the relationship. Instead, the Board's decision was based on the appearance of subterfuge and the possibilities Levin would have to exert control over TAG–Nevada through his personal relationship with Kraft. Because the Board's denial of licensing was directly related to a significant state interest, the Board's action did not violate any free association right Kraft may have.

. . . .

LIC and TAG, Inc., are unsuitable companies. . . . I also feel Mr. Levin is unsuitable. I think that should have been abundantly clear from our meeting last week.

I have a real concern that you are going to continue to work for two unsuitable companies while you are purportedly the head of a company that would hold a Nevada gaming license. In addition, I am concerned that you would continue to have a personal relationship with someone I consider to be unsuitable while you were the purported head of a company with a Nevada gaming license.

**14.** Board member Rumbolz stated:

[W]hat we have is your client continuing her employment as an employee of Mr. Levin, continuing to live with him, continuing to live in the East Coast, putting nothing at risk in purchasing this company, and as far as I can see, having no different involvement with this company than she had before, other than the name change of title.

I view this as nothing more than a subterfuge. I think this is Howard Levin using Sydell Kraft to maintain the same relationship he had before. . . .

**12.** Nev.Rev.Stat. § 463.170(2)(b) provides that "[a]n application to receive a license or be found suitable shall not be granted unless the commission is satisfied that the applicant is: . . . (b) A person whose . . . reputation, habits and associations do not pose a threat to the public interest of this state or to the effective regulation and control of gaming, or create or enhance the dangers of unsuitable, unfair or illegal practices methods and activities in the conduct of gaming or the carrying on of the business and financial arrangements incidental thereto. . . ."

**13.** As Board member Rumbolz stated during the licensing proceedings,

Mr. Levin was not in my mind unsuitable because of associations with organized crime members or some nefarious criminal past he may himself have had. However, I am very concerned since he is the gentleman that's been teaching this lady her management in gaming companies, since he is the gentleman that will undoubtedly be the person she looks to for advice for management of a gaming company, that she will be receiving advice and has received training from somebody who does not understand this industry and is unsuitable for licensing.

## CONCLUSION

Plaintiffs have failed to establish protected liberty or property interests that would trigger procedural due process protections. In addition, plaintiff Kraft has failed to establish a violation of any free association right that may arise from her relationship with Levin. Because we conclude that plaintiffs cannot succeed on the merits of their claims, we find it unnecessary to address the issues of immunity and causation. The district court's order of summary judgment in favor of the Board is AFFIRMED.

CANBY, Circuit Judge, concurring:

I concur in Judge Choy's thorough opinion. I write separately only because I wish to add a few words regarding Kraft's freedom of association claim. Kraft contends that the Board violated her free association rights by basing its denial of TAG–Nevada's license on her personal relationship with Levin.

That claim, however, misperceives the record. Kraft's intimate association was far from the focus of the Board's action. The uncontroverted evidence makes clear that the Board's central concern was that Levin, whom it had found unsuitable to hold a Nevada gaming license, remained in effective control of TAG–Nevada. The totality of circumstances known to the Board lent substance to its fears. Levin had conveyed the ownership interest in TAG–Nevada to Kraft only after it became clear that the Board would deny a license if Levin remained as owner. Kraft gave only a note in return for the ownership interest; she made no other investment in TAG–Nevada and remained financially dependent upon Levin. And she continued to live with Levin. None of these facts is controverted. For the Board to have determined from all of the circumstances that Levin remained in control, or was likely to resume control, of TAG–Nevada was certainly permissible. To characterize the Board's action as a penalty or condition imposed on Kraft's intimate association with Levin is to ignore most of the evidence.

It is true that Kraft's living with Levin was one of the many circumstances that the Board considered relevant to the question of Levin's control of TAG–Nevada. To the extent that such consideration may be viewed as an incidental burden on Kraft's associational interests, it was justified in the circumstances of this case by Nevada's governmental interest in maintaining the integrity of public licensed gaming. *See* Nev.Rev.Stat. § 463.0129. Whether the Board would or could prevail if it were faced *only* with the fact of Kraft's personal relationship with Levin need not be decided; the Board acted on the totality of circumstances. In so acting, it did not infringe Kraft's rights.