**Diane PIETROFESO, Plaintiff,**

**v.**

**UNITED STATES of America, et al., United States Customs Service, Carol Hallett, Commissioner of Customs and Nicholas Brady, Secretary of the Treasury, Defendants.**

**Court No. 91–12–00897.**

United States Court of International Trade.

Aug. 25, 1992.

---

744

Bettina Schein, New York City, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Joseph I. Liebman, Attorney-in-Charge, Intern. Trade Field Office, Pamela G. Larrabee, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## OPINION

RESTANI, Judge:

On December 20, 1991, plaintiff filed a Summons and Complaint with the Clerk of this court, contesting the decision of the Secretary of the Treasury to affirm the denial of her application for a customs broker's license. Defendants have moved for judgment upon the administrative record, and dismissal of the action.

This court has jurisdiction to review the denial of an application for a customs broker's license pursuant to 28 U.S.C. § 1581(g)(1) (1988).[1] 19 U.S.C. § 1641(e)(3)

---

1. This section provides as follows:

(g) The Court of International Trade shall have *exclusive jurisdiction of any civil action commenced to review*—

(1) any decision of the Secretary of the Treasury to deny a customs broker's license under section 641(b)(2) or (3) of the Tariff Act of 1930, or to deny a customs broker's permit under section 641(c)(1) of such Act, or to

(1988) provides that the factual findings of the Secretary of the Treasury are conclusive if supported by substantial evidence. 28 U.S.C. § 2640(a)(5) (1988) provides, however, that an appeal of a license denial shall be determined on the basis of the evidence presented to the court. As plaintiff did not seek leave to present additional evidence to the court, as permitted by 19 U.S.C. § 1641(e)(4),[2] the court shall decide this matter based only upon the record that was before the agency.

### Background

On August 28, 1989, the Customs Service received plaintiff's application for a customs broker's license.[3] The application revealed that the applicant was 28 years old and that she had worked in the customs field since 1982. She stated that the license would entitle her to raises and promotions at her place of employment. Plaintiff passed the written broker's examination required by 19 C.F.R. § 111.13. Her application was then sent to the office of the Special Agent in Charge, JFK Airport, in order for a background investigation to be conducted pursuant to 19 C.F.R. § 111.-14.

The results of the background investigation are set forth in the Report of Investigation, dated May 22, 1990. A heavily redacted version of this report is contained in the administrative record. The report revealed that plaintiff had no arrest record. Interviews with plaintiff's employers and listed references bared no negative information regarding plaintiff. *See* Administrative Record Document ("A.Rec.Doc.") B

at 7 (plaintiff was a "good employee"); *id.* at 8 (all references "responded favorably to the qualifications, integrity, and honesty of [plaintiff]"). The report ultimately noted that "no derogatory information on the applicant" had been uncovered. *Id.* at 2.

The background inquiry indicated, however, that plaintiff was "the niece of John Gotti (reputed leader of the Gambino Crime Family), and the daughter of Peter Gotti, (reputed captain of this criminal organization)." *Id.* at 2. A significant portion of the report was devoted to describing the criminal histories of various members of the Gotti family, including a number of criminal convictions of the applicant's father and her uncles, John and Eugene Gotti. The report noted that the Gambino family "influence[s] ... commercial trade through trucking, warehousing, and union controls at JFK Airport and the Brooklyn Waterfront." *Id.* at 23. The only explicit reference in the report to plaintiff's associations with her family is a reference to plaintiff's 1989 wedding reception, which the report indicated was arranged by her father and attended by a number of alleged Gambino crime family members. *Id.* at 15.

Plaintiff's husband, Paul Pietrofeso, was also mentioned in the report. Mr. Pietrofeso purchased a partial ownership of a company, Cory Contemporary Contractors Inc. ("Cory"), in 1989. The report stated that a discrepancy was uncovered during the interview of Cal Classi, Mr. Pietrofeso's cousin and the president of Cory. Although Mr. Pietrofeso stated that he purchased his

revoke a license or permit under section 641(b)(5) or (c)(2) of such Act; ...
28 U.S.C. § 1581(g)(1) (1988).

2. This section provides, in part, as follows:
If any party applies to the court for leave to present additional evidence and the court is satisfied that the additional evidence is material and that reasonable grounds existed for the failure to present the evidence in the proceedings before the hearing officer, the court may order the additional evidence to be taken before the hearing officer and to be presented in a manner and upon the terms and conditions prescribed by the court.
19 U.S.C. § 1641(e)(4) (1988).

3. A customs broker's license may be granted to an individual by the Secretary of the Treasury pursuant to the following provision:
The Secretary may grant an individual a customs broker's license only if that individual is a citizen of the United States. Before granting the license, the Secretary may require an applicant to show any facts deemed necessary to establish that the applicant is of good moral character and qualified to render valuable service to others in the conduct of customs business. In assessing the qualifications of an applicant, the Secretary may conduct an examination to determine the applicant's knowledge of customs and related laws, regulations and procedures, bookkeeping, accounting, and all other appropriate matters.

share of Cory for between $20,000 and $30,000 on August 1, 1989, Mr. Classi reported that Mr. Pietrofeso's investment consisted only of a "van and some tools." *Id.* at 11. A financial inquiry revealed that on August 8, 1989, Mr. Pietrofeso deposited $15,000 in cash into Cory's bank account.[4] The report also contained the statement that "additional [ ][5] intelligence revealed that Paul Pietrofeso is well thought of within the structure of the Gambino Crime Family." *Id.* at 13.

In a letter dated February 22, 1991, plaintiff was informed that her customs broker's application had been denied. The letter stated that "[t]he required investigation … indicated derogatory information, namely that you are related by blood and marriage to organized crime members." A.Rec.Doc. E at 1. Plaintiff appealed the denial to the Commissioner of Customs, and was permitted to make an oral presentation and submit a written memorandum in opposition to the denial. In her memorandum plaintiff denied that she was "related by blood and marriage to organized crime members," and alternatively that such relationship could not be the basis for the license denial. In a letter dated July 11, 1991, plaintiff was informed that Customs had upheld the denial.

Plaintiff appealed this decision to the Secretary of the Treasury ("Secretary"). By a letter dated October 21, 1991, the Assistant Secretary of the Department of Treasury (Enforcement), informed plaintiff's counsel that plaintiff's application was being denied under 19 C.F.R. §§ 111.-16(b) and 111.16(b)(3).[6] The letter stated that plaintiff's "relationships with reputed organized crime members" constituted sufficient grounds for the denial under the relevant regulations. A.Rec.Doc. M at 1.

Plaintiff commenced this civil action seeking review of the October 21 determination by the Secretary. The government maintains that plaintiff's relationships with reputed organized crime members constitute sufficient grounds for the denial of her application and, accordingly, the decision of the Secretary should be affirmed.

### Discussion

Although the Customs Service denied plaintiff's application based solely upon 19 C.F.R. § 111.16(b)(3) ("[a] failure to establish the business integrity and good character of the applicant"), the Secretary's decision rested upon 19 C.F.R. § 111.16(b)(3) and the catch-all 19· C.F.R. § 111.16(b) ("The causes sufficient to justify denial … shall include, *but need not be limited to* …") (emphasis added). Therefore, it is necessary to view the Secretary's decision through this more general prism.

Plaintiff argues that the Secretary's decision violates substantive and procedural due process, and freedom of association, and was arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

### I. *Due Process*

Plaintiff claims that the denial of her application violated her right to procedural due process under the Fifth Amendment to the United States Constitution. Plaintiff contends that she has a legitimate claim of entitlement to the license according to the Customs Regulations, and this suffices as a property interest in a benefit. Plaintiff also maintains that she has a protected liberty interest in both engaging in a customs occupation and in her reputation. Defendants argue that plaintiff lacks either a protected property or liberty interest.

 The requirements of procedural due process do not apply to a limitless range of

---

19 U.S.C. § 1641(b)(2) (1988).

**4.** Of this amount, $14,000 was "in hundreds." Mr. Pietrofeso did not offer an explanation as to the source of the capital.

**5.** A word or phrase has been redacted from the public version of the report.

**6.** The pertinent sections provide:

(b) **Grounds for denial.** The causes sufficient to justify denial of an application for a license shall include, but need not be limited to:

 \* \* \* \* \* \*

(3) A failure to establish the business integrity and good character of the applicant;

 \* \* \* \* \* \*

19 C.F.R. § 111.16(b) (1991).

interests; rather, a prior hearing is required only where a property or liberty interest is at stake. *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).[7] Of course, the property interests protected by procedural due process extend beyond a narrow construction of "real property," reaching "interests that a person has already acquired in specific benefits." *Id.* at 576, 92 S.Ct. at 2708. Thus, where a person has a legitimate claim of entitlement to a benefit, that person is entitled to procedural due process. *See Scott v. Kewaskum,* 786 F.2d 338, 339 (7th Cir.1986) quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709).[8]

■ In this case, the statute and controlling regulations clearly do not provide an applicant with an entitlement to a customs broker's license. The statute does not tell the Secretary when he or she must grant a license. *See* 19 U.S.C. § 1641(b)(2) (1988) ("The Secretary *may* grant an individual a customs broker's license ...") (emphasis added). Likewise, the regulations provide the Secretary with a certain amount of discretion. *See supra* n. 6. To construe the statute and regulations as granting an applicant a property interest in a customs broker's license would curb the Secretary's discretion in a manner inconsistent with such statute and regulations. In *Scott v. Kewaskum,* the Seventh Circuit held that a village board's denial of a liquor license did not deprive applicants of a property interest within the meaning of the Fourteenth Amendment. *Scott,* 786 F.2d 338. The *Scott* court observed that the Wisconsin statute governing the grant of liquor licenses conditions licenses on the citizenship, age and good moral character of the

applicant. *Id.* at 340. The court noted, however, that "although the statute specifies people to whom licenses must be denied, it does not say when a license must be granted." *Id.* Ultimately, the court concluded, the lack of substantive criteria in the statute meant that there was no "property" interest.[9] This rationale has clear application to the statute and regulations pertaining to customs brokers' licenses; nowhere do these provisions state in which situations a customs broker's license *must* be granted. Thus, plaintiff's argument that she has a property interest in obtaining a customs broker's license is not persuasive.

■ Plaintiff also bases her procedural due process argument on the deprivation of a constitutionally protected liberty interest. As used in the due process clause, "liberty" includes

> the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men.

*Roth,* 408 U.S. at 572, 92 S.Ct. at 2707 (quoting *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)). Plaintiff has not been denied the right to work in any of the "common occupations"; absent a customs broker's license, plaintiff may still work in the field of customs and pursue a career in this area.

■ There is some question as to whether a constitutionally protected liberty

---

**7.** *Roth* and most of the other cases cited in this opinion involve procedural due process under the Fourteenth Amendment; however, the same analysis applies under the due process clause of the Fifth Amendment.

**8.** The person must demonstrate more than an abstract need or desire for a property interest, and must show more than simply a unilateral expectation of it. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709.

**9.** Decisions holding that applicants have a constitutionally protected property right in a license

are distinguishable because these cases do not involve statutes that grant the licensing authority broad discretion to deny the application. *See, e.g., Charry v. Hall,* 709 F.2d 139, 144 (2d Cir.1983) (applicant had a legitimate claim of entitlement to take the examination for the professional status of psychologist, and "[d]ecisions to the contrary are distinguishable on the ground that, unlike the present case, they involved statutes granting broad and almost unlimited discretion to the licensing authority to deny the application.").

interest also may be implicated where a person's reputation is damaged. *See Siegert v. Gilley,* —— U.S. ——, —— – ——, 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991). In any case, the offending federal action must be sufficiently serious to affect government employment, (*see Paul v. Davis,* 424 U.S. 693, 706, 96 S.Ct. 1155, 1163, 47 L.Ed.2d 405 (1976)), or must significantly foreclose plaintiff's "freedom to take advantage of other employment opportunities." *Bollow v. Fed. Reserve Bank of San Francisco,* 650 F.2d 1093, 1101 (9th Cir.1981) (quoting *Jablon v. Trustees of Cal. State Colleges,* 482 F.2d 997, 1000 (9th Cir.1973), *cert. denied,* 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974)). Furthermore, accusations rise to the level of harming a person's good name, reputation or integrity only when they are publicized. *Id.* at 1101. There have been no allegations that the Customs investigatory report was published to plaintiff's employer or that she has suffered any loss of reputation in her employer's eyes, because of disclosure of her family relationships. Because the court determines that the license denial does not affect plaintiff's property or liberty interests, she cannot show that her due process rights were violated.

## II. Freedom of Association

■ The First Amendment right to freedom of association protects "certain kinds of highly personal relationships." *Roberts v. United States Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 3250, 82 L.Ed.2d 462 (1984). Plaintiff argues that by denying her license solely on the grounds of family relations, the Secretary has violated her right to associate freely with her family.[10] The government, although not disputing that plaintiff's intimate relationships with her family are afforded special constitutional protection,[11] maintains that even fundamental rights must give way to compelling governmental interests. The government argues that the Secretary could have reasonably concluded that the compelling governmental interest in preventing use of a customs broker's license for money laundering or importation of illegal merchandise outweighs the protection afforded plaintiff's connections with her family.

As noted earlier, the investigation disclosed no derogatory information about plaintiff. The application was rejected by the Secretary for one or both of the following reasons: (1) family ties to reputed organized crime members (§ 111.16(b)); or (2) the applicant's character and business integrity are tainted by her family relationship to alleged mobsters (§ 111.16(b)(3)).

The reasoning of the Ninth Circuit in *Kraft v. Jacka,* 872 F.2d 862 (9th Cir.1989) is instructive. In *Kraft,* plaintiffs (Sydell Kraft and three corporate plaintiffs) applied to the Nevada Gaming Board ("the Board") for licenses to manufacture, distribute and operate gaming devices. While these applications were pending, the Board became concerned about the suitability for licensing of the corporate plaintiffs and their president Howard Levin. Ultimately, plaintiffs received limited, one-year licens-

---

**10.** Although plaintiff cites to cases discussing *criminal* liability based on associations with certain individuals, the reasoning of those cases applies to civil matters, as well. The imputation of guilt or individual responsibility because of mere association is an anathema to our system of justice. *See generally Plyler v. Doe,* 457 U.S. 202, 220, 102 S.Ct. 2382, 2396, 72 L.Ed.2d 786 (1982) ("legislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice."). As Rosalind observed in *As You Like It,* "[t]reason is not inherited." William Shakespeare, *As You Like It,* act 1, sc. 3, ln. 61, p. 375 (Riverside 1974).

**11.** The Supreme Court has recognized that "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality opinion) (quoting *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 639–640, 94 S.Ct. 791, 796–797, 39 L.Ed.2d 52 (1974)); *see also Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967). Numerous cases have "consistently acknowledged a 'private realm of family life which the state cannot enter.'" *Moore,* 431 U.S. at 499, 97 S.Ct. at 1935 (quoting *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944)). *See also Planned Parenthood v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2806–08, 120 L.Ed.2d 674 (1992).

es. When plaintiffs applied for permanent licenses, the Board again raised numerous concerns about Levin and two of the corporate plaintiffs. Prior to the Board's decision, plaintiffs withdrew the applications of the two corporations. Levin's interests were transferred to Kraft, with whom he had a close personal relationship. Thus, the Board considered only the applications of Kraft and the one remaining corporate entity. The Board voted to recommend denial of the application. The issue before the court was whether Kraft's right to free association had been violated when the Board refused to grant her application for a gaming license because she would not terminate her personal relationship with a certain "unsuitable" individual. *Id.* at 871–73.

Noting that although "[t]he relationship between Kraft and Levin as cohabitating, single adults may fit within our description of an intimate protected association ...," the court held that it did not need to reach this issue because it concluded that the actions of the Board did not violate plaintiff's free association right. *Id.* at 872. The crucial step in the court's reasoning was the following observation:

> On the surface, the Board might appear to be violating Kraft's fourteenth amendment right by conditioning receipt of a gaming license on the termination of a possibly protected relationship. However, the Board did not deny licensing because it disapproved of the fact that Levin and Kraft were unmarried. The personal relationship between Kraft and Levin was not even the principal reason for the denial. The Board members clearly indicated that the personal rela-

tionship would not have been a deciding factor in the decision to deny further licensing if the transfer of control over TAG–Nevada from Levin to Kraft had not looked so much like a mere subterfuge.

*Id.* at 872. The court emphasized that the decision of the Board was "based on the appearance of subterfuge and the possibilities Levin would have to exert control over TAG–Nevada [the remaining corporate applicant] through his personal relationship with Kraft." *Id.* at 873. The court also emphasized that a compelling governmental interest was at stake, namely, the need to prevent criminal or corrupt elements from gaining a foothold in licensed gaming. The Nevada statute specifically provided for the strict regulation of all persons involved in gaming establishments in order to preserve the public confidence in the honest and competitive conduct of the industry. *See id.* at 872–73.[12]

The *Kraft* court concluded that "[b]ecause the Board's denial of licensing was directly related to a significant state interest, the Board's action did not violate any free association right Kraft may have." *Id.* at 873. In the case before the court, the government maintains that, like the gambling industry, the customs field must be kept free from even the suggestion of criminal influences. The government argues that legislative history surrounding licensing of customs brokers indicates that Congress intended the Secretary to have similarly wide discretion in licensing.[13] Although the emphasis in the legislative history is on supervising and regulating the activities of customs brokers to prevent

---

**12.** In fact, the Nevada statute stated that a gaming license should not be granted unless the Nevada Gaming Commission was satisfied that the applicant's "reputation, habits and *associations* do not pose a threat to the ... effective regulation and control of gaming...." *Id.* at 867 n. 6 (quoting Nev.Rev.Stat. § 463.170(2)(b)) (emphasis added).

**13.** [I]n view of the large opportunities for profitable fraud open to dishonest persons who, from the very nature of things, occasionally succeed in obtaining licenses as customhouse brokers despite the strictest possible investiga-

tion by the Treasury of their character and qualifications, it is essential that the Department have wide discretion in dealing with these brokers and that the Secretary of the Treasury, therefore, be given broad powers to supervise and regulate their activities. Under existing law his powers in these respects are very limited, and it is the purpose of the present amendments to broaden the Secretary's powers so that he can in the future more effectively cope with frauds practiced by customhouse brokers on both importers and the revenues of the United States.
S.Rep. No. 1170, 74th Cong., 1st Sess. 3 (1935).

fraud, Congress clearly intended the Secretary as part of his supervisory duties to take steps to insure that customs brokers are honest. Customs brokers are fiduciaries, in whom the public must have trust. Thus, keeping organized crime out of the key importing roles would further important governmental interests in both its own operations and the public welfare. The issue here is whether in attempting to effectuate these significant governmental interests, the Secretary has employed the proper analysis and come to substantially supported factual findings.

We turn first to the question of whether the Secretary has violated plaintiff's right of association by denying her a license based upon her marital relationship. Although the marital relationship may not be interfered with lightly, *see Zablocki v. Redhail*, 434 U.S. 374, 384–85, 98 S.Ct. 673, 679–80, 54 L.Ed.2d 618 (1978), a compelling governmental interest in preventing illegal activity in importing may justify the limited intrusion discussed here. Customs brokers are largely unsupervised; a licensed customs broker who may be influenced or controlled by organized crime figures provides a ripe opportunity for illegal activity. If plaintiff cohabitates with her husband and he is engaged in organized crime, she may be denied a license even though she has no personal history of criminal activity, if the Secretary is able to draw the reasonable inference that she would not be in a position to avoid improper influence or intimidation in her importing duties. Here, however, the Secretary has not stated expressly that this inference is drawn.

It should be borne in mind that under 19 C.F.R. § 111.16(b) plaintiff has the burden of establishing her business integrity, including her ability to function freely as a legitimate customs broker. Plaintiff made no effort to show she has the ability to insulate herself from improper influence or intimidating tactics by her husband. Rather, apart from the constitutional issues, her argument is that her husband is not involved in organized crime, and therefore, the Secretary has no basis for concluding she would be subject to illegal influence or intimidation.

For its part, the government has not placed in the record information demonstrating that plaintiff's husband lacks a legitimate source of income or that he does business with organized crime figures. There is only the weakest hearsay evidence of his link to organized crime and none at all linking him to criminal activities at Kennedy airport. The court is not convinced that the evidence in the record demonstrates a connection to organized crime or criminal activity in the venue in which plaintiff seeks to work. Furthermore, there is no indication in the record indicating that the allegations of a link to organized crime are reliable. *Cf. Anderson v. United States*, 16 CIT ——, —— – ——, 799 F.Supp. 1198, 1202 (1992) (reliable hearsay evidence may be considered in administrative proceedings). Accordingly, the record does not reveal that this aspect of the Secretary's decision is based on substantial evidence. Thus, remand is necessary for further explanation and consideration of evidence of the source of income of plaintiff's husband and his relationship, if any, to criminal activity, as well as the potential affect of such activity on plaintiff. Both the Secretary and the plaintiff should address themselves to the relevant inquiries.

Plaintiff's relationships with her blood relatives are subject to a similar analysis. Different questions, however, remain unanswered. The record reveals that some of the applicant's relatives are or were engaged in criminal activity. The record is less clear as to how this activity affects the importing venue in which the applicant is likely to work, and how the applicant would be affected.

As indicated, the court received a highly redacted version of a Customs investigatory report. It does not reveal the source of most of the information it contains and there are no explanatory memoranda in the record. There is simply a one-line conclusion that plaintiff's family members are involved in organized crime. There is no rational relationship between mere blood relationships and character or business integrity. There may, however, be a rational

relationship between legitimate concerns for business integrity and close associations with organized crime figures.[14] The government seems to want the court to take judicial notice of certain facts about organized crime and familial relationships of persons associated with organized crime. The determination at issue, however, is one which must be supported by the record. It is up to the Customs Service and the Secretary to determine whether plaintiff's business integrity is negatively affected because she is likely to be influenced or controlled by persons involved in criminal activities and, if so, to state why they have drawn such a conclusion. This analysis is absent from the record before the court.

Accordingly, this matter is remanded for forty-five days within which the Secretary shall analyze the data in the record for reliability, gather new data if necessary, explain his conclusions and, if the conclusions are adverse to plaintiff, give plaintiff an opportunity to respond.

---

**14.** Plaintiff has not raised a claim based on the Equal Protection clause of the Constitution; therefore, the court need not decide whether decisions based solely on blood relationships warrant a higher level of scrutiny than a simple rational basis test. Courts apply a stricter scrutiny to legislation which classifies according to a "suspect basis," (*see, e.g., Palmore v. Sidoti,* 466 U.S. 429, 432, 104 S.Ct. 1879–1882, 80 L.Ed.2d 421 (1984) (racial classifications "subject to the most exacting scrutiny"); *Graham v. Richardson* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971) ("classifications based on alienage, like those based on nationality or race are inherently suspect")), or limits fundamental constitutional rights, *see, e.g., Kramer v. Union Free School District,* 395 U.S. 621, 626, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969) (voting).