**Slip Op. 06-100**

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————  :

PATRICK BUTLER,

                    *Plaintiff,*

             v.                             Court No. 04-00584

UNITED STATES OF AMERICA,

                    *Defendant.*

———————————————————————  :

[Plaintiff's Motion to Transfer action to U.S. District Court pursuant to 28 U.S.C. § 1631 granted.]

Decided:  June 30, 2006

Law Office of Stephen J. Leahy (Stephen J. Leahy), for Plaintiff.

Peter D. Keisler, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (James A. Curley); for Defendant.

**OPINION**

RIDGWAY, Judge:

In this action, Plaintiff contests the revocation of his customhouse broker's license, which resulted from his failure to file a triennial status report with the U.S. Customs Service (now the Bureau of Customs and Border Protection) in February 2003.[1]

———————————

[1]Effective March 1, 2003, the Customs Service (formerly part of the U.S. Department of the Treasury) was renamed the Bureau of Customs and Border Protection of the U.S. Department of Homeland Security.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296 § 1502, 2002 U.S.C.C.A.N. (116 Stat. 2135, 2308).  For the sake of convenience, the agency is referred to as "Customs" herein.

Now pending before the Court are Plaintiff's Motion to Transfer Case to Federal District Court and his supporting memorandum of points and authorities ("Plaintiff's Brief"), seeking the transfer of this action to the U.S. District Court for the District of Massachusetts. The Government opposes Plaintiff's motion. *See* Defendant's Opposition to Plaintiff's Motion to Transfer This Action to District Court ("Defendant's Brief").[2]

For the reasons set forth below, Plaintiff's Motion to Transfer is granted.

## I. The Facts of The Case

According to the Complaint in this matter, Plaintiff – then a licensed customs broker, employed in Massachusetts – changed his residence in 2001. Although Plaintiff states that he gave Customs timely notice of his change of home address, it appears that the agency failed to record that change. Complaint ¶¶ 3-7; Administrative Record ("A.R.") 9 (May 13, 2003 letter to Customs from counsel for Plaintiff).[3]

---

[2]Although the parties' Joint Status Report indicated that the Government "seeks dismissal of [this] case," the Government has filed no motion to dismiss to date. *See* Joint Status Report (April 5, 2006). Nor does the Government pray for dismissal in Defendant's Opposition to Plaintiff's Motion to Transfer This Action to District Court ("Defendant's Brief").

[3]The instant case thus appears to be distinguishable on its facts from another recent similar case (discussed in greater detail below), in which the broker failed to give Customs notice of his change of address. *See* Retamal v. U.S. Customs & Border Protection, Dep't of Homeland Security, 28 CIT ____, ____, 2004 WL 2677199 at * 2 (2004), *vacated in part and rev'd in part*, 439 F.3d 1372 (Fed. Cir. 2006) (noting that "there was no immediate notice of the [broker's] change [of address] given to Customs").

In 2003, Plaintiff neglected to file a triennial status report on or before March 1, as required by 19 U.S.C. § 1641(g)(1) (2000) and 19 C.F.R. § 111.30(d) (2003).[4]  Complaint ¶¶ 8-9.[5]  As a result, Plaintiff's customs broker's license was suspended pursuant to 19 U.S.C. § 1641(g)(2).  Complaint ¶ 10.[6]

---

[4]All statutory references herein are to the 2000 edition of the United States Code, and all citations to regulations are to the 2003 edition of the Code of Federal Regulations.

[5]The statute requires every customs broker to file a triennial status report stating "(A) whether such person is actively engaged in business as a customs broker; and (B) the name under, and the address at, which such business is being transacted."  19 U.S.C. § 1641(g)(1).

In general, the implementing regulations supplement the statute, imposing more detailed requirements – for example, specifying that status reports are due in February "of each third year"; outlining the requisite basic content of reports; mandating that each report be accompanied by payment of a fee; and stating to whom reports are to be addressed.  *See generally* 19 C.F.R. § 111.30(d)(1)-(3).

As discussed below, however, Plaintiff contends that – in one critical respect – the regulations contradict the language of the statute itself.  *Compare* 19 U.S.C. § 1641(g)(2)(B) *with* 19 C.F.R. § 111.30(d)(4).

[6]According to 19 U.S.C. § 1641(g)(2):

(2) Suspension and revocation

   If a person licensed [as a customs broker] . . . fails to file the required report by March 1 of the reporting year, the license is suspended, and may be thereafter revoked subject to the following procedures:

      (A) The Secretary shall transmit written notice of suspension to the licensee no later than March 31 of the reporting year.

      (B) If the licensee files the required report *within 60 days of receipt of the Secretary's notice*, the license shall be reinstated.

      (C) In the event the required report is not filed within the 60-day period, the license shall be revoked without prejudice to the filing of an application for a new

On March 7, 2003, Customs sent written notice of Plaintiff's suspension, via certified mail, return receipt requested, in accordance with the statute and regulations. Complaint ¶ 14; A.R. 7-8 (March 7, 2003 suspension notice and envelope);[7] 19 U.S.C. § 1641(g)(2)(A); 19 C.F.R. §

license.

19 U.S.C. § 1641(g)(2) (emphasis added). *Compare* 19 C.F.R. § 111.30(d)(4) (providing that the running of 60-day clock for curing the failure to timely file a status report is triggered not by a broker's receipt of a notice of suspension, but – rather – by "the date of [Customs'] notice of suspension").

[7] In fact, the envelope from Customs actually bears a meter mark/postmark of March 7, 2002 – not 2003. *See* A.R. 8. That irregularity alone would tend to discredit (or at least substantially undermine the evidentiary weight of) the envelope as proof of "the date of the notice of suspension" – which, according to Customs, triggers the 60-day clock under 19 C.F.R. § 111.30(d)(4). *Cf.* Atteberry v. United States, 27 CIT ____, 267 F. Supp. 2d 1364 (2003) (although Government invoked presumption of regularity, and although senior Customs official attested in sworn affidavit filed with the court that consistent agency practice was to mail notices to importers on date that appears on face of notice, postmark on envelope unequivocally proved that notice at issue was in fact mailed six days after date on face of notice; plaintiff importer's case thus was filed within statutory 180-day period, and Government's motion to dismiss was denied).

Indeed, the discrepancy arguably could be interpreted to suggest that the meter mark/postmark on the envelope in this case was subject to tampering – that is, for example, that someone who was intentionally adjusting the meter so that it would stamp envelopes "March 7" (rather than some other, later date) inadvertently altered the year from "2003" to "2002."

In any event, the date on the envelope would appear to be a critical piece of evidence for the Government – key to establishing the actual "date of the notice of suspension." But, here, the envelope is of dubious evidentiary value. And, absent proof that Customs in fact sent the notice of suspension to Plaintiff on March 7, 2003, it is not clear how Customs can defend its revocation of Plaintiff's license – even under the agency's own regulation. Plaintiff notes that, assuming (for the sake of argument) that the 60-day clock began to run on March 7, 2003, he tendered his status report a mere eight days after the 60-day grace period expired. *See* A.R. 9 (May 13, 2003 letter to Customs from counsel for Plaintiff). In other words, even under Customs' interpretation of the statute (which Plaintiff vigorously disputes), Plaintiff's status report was timely unless "the date of the notice of suspension" was more than 60 days before May 13, 2003. And, under the circumstances of this case, it is not clear how the precise "date of the notice of suspension" can be definitively established.

111.30(d)(4). That notice, however, was sent to Plaintiff's former home address – the home address listed on his triennial report filed in 2000. Because the notice was misaddressed, the U.S. Postal Service did not deliver it, and returned it to Customs instead. Complaint ¶¶ 14-15, 27; A.R. 5 (2000 triennial report); A.R. 8 (envelope addressed to Plaintiff's former residence, stamped by U.S. Postal Service "Forwarding Order Expired," and returned to/signed for by Customs mailroom employee). Thereafter, Customs reportedly made some effort to reach Plaintiff through his employer, but failed. A.R. 10 (May 16, 2003 letter from Customs to counsel for Plaintiff, stating that agency personnel "made every attempt" to contact Plaintiff at his place of employment).[8]

---

[8]The Administrative Record filed in this matter is incomplete. Customs' letter dated May 16, 2003 refers to "copies of the returned envelopes and the 2000 status report which show that [agency] personnel made every attempt to . . . contact [Plaintiff] at the place of employment listed on his [2000] triennial report," and which were apparently enclosed with the May 16, 2003 letter. However, those documents are missing from the record filed with the Court. *See* A.R. 10.

In any event, it seems that Plaintiff's employer relocated sometime between February 2000 and February 2003; and, despite the fact that a forwarding order was then on file with the U.S. Postal Service (and, indeed, was still in effect at least as late as May 2003), the Postal Service failed to forward Customs' mailing to Plaintiff from his employer's former address to his employer's new address. *See* A.R. 11 (June 5, 2003 letter to Customs from counsel for Plaintiff, noting that – as of that date – "the Post Office [was] still forwarding mail to [Plaintiff's employer's] new address"). (As an aside, it is unclear why – if, in fact, "[Plaintiff's] employment status . . . did not change from the filing of the [2000] triennial report to [the 2003] report" – Plaintiff indicated on his 2003 triennial status report that he was *not* then "actively engaged in conducting Customs business as a broker." *Compare* A.R. 6 *with* A.R. 9.)

Finally, there is no indication in the record that Customs ever tried to contact Plaintiff by phone, although "his work phone number did not change and his home phone number did not change" between 2000 and 2003. A.R. 9. *Compare* A.R. 5 (2000 triennial status report) *with* A.R. 6 (2003 triennial status report). It is thus hyperbole for Customs to claim that it "made *every* attempt" to contact Plaintiff "at the place of employment listed on his [2000] triennial report." A.R. 10 (May 16, 2003 letter from Customs to counsel for Plaintiff) (emphasis added).

In May 2003, Plaintiff independently realized that he had neglected to file the requisite triennial status report, and contacted Customs authorities in Boston. Complaint ¶¶ 16-17; A.R. 9 (May 13, 2003 letter to Customs from counsel for Plaintiff). Plaintiff first received notice of the suspension of his license on May 12, 2003, when Customs officials in Boston faxed a copy of the notice to him. One day later, on May 13, 2003, he submitted both his triennial status report and the required filing fee. Complaint ¶¶ 18-19, 23-24, 28; A.R. 9. But Customs officials in Boston returned the report and fee to Plaintiff on May 16, 2003, because they had not been filed within 60 days of March 7, 2003 – the date of the notice of suspension. Complaint ¶ 20; A.R. 10 (May 16, 2003 letter from Customs to counsel for Plaintiff).

Plaintiff protested that the statute, on its face, allows a broker to avoid the revocation of his license by filing his status report within a 60-day "grace period" that begins to run upon the broker's *receipt* of notice of the suspension of his license. A.R. 11 (June 5, 2003 letter to Customs from counsel for Plaintiff) (highlighting "the difference in language between the statute and the regulation"); *see also* A.R. 9 (May 13, 2003 letter to Customs from counsel for Plaintiff). Plaintiff asserted that Customs' regulation – which runs the 60-day clock from *the date of the notice* of suspension – is inconsistent with the plain language of the statute itself. A.R. 9; A.R. 11.[9] Plaintiff emphasized that, in accordance with the language of the statute, his 2003 status report was filed within 24 hours of his receipt of the notice of suspension. A.R. 9. And Plaintiff argued that the

---

[9]*Compare* 19 U.S.C. § 1641(g)(2)(B) (suspended license to be reinstated if status report is filed "within 60 days of receipt of the Secretary's notice [of suspension]") *with* 19 C.F.R. § 111.30(d)(4) (suspended license to be reinstated if triennial status report is filed "within 60 calendar days of the date of the notice of suspension").

application of Customs' regulation is particularly unjust where, as here, the broker's failure to receive the notice is not due to any act or omission by the broker himself. A.R. 9; A.R. 11.[10]

Plaintiff's arguments and objections were to no avail. Notice of the revocation of Plaintiff's customs broker's license was published in the Customs Bulletin and in the Federal Register in April 2004. Complaint ¶ 21; 38 Customs Bulletin & Decisions No. 16 at 2 (April 14, 2004); 69 Fed. Reg. 17,214 (April 1, 2004). This action ensued.

## II. The Procedural History of The Case

Within a week of the filing of Plaintiff's action, an opinion issued in Retamal, a case with strikingly similar facts. *See* Retamal v. U.S. Customs & Border Protection, Dep't of Homeland Security, 28 CIT ____, ____, 2004 WL 2677199 (2004), *vacated in part and rev'd in part*, 439 F.3d 1372 (Fed. Cir. 2006). The Court of International Trade there granted summary judgment in favor of the Government, finding that action "time-barred by operation of the law." 28 CIT at ____, 2004 WL 2677199 at * 3 (*citing* 19 U.S.C. § 1641(g)(2)).[11]

---

[10]As Plaintiff emphasizes, a broker's receipt of a notice of suspension may be thwarted – through no fault of his own – if, for example, (1) Customs fails to update its database to reflect a broker's timely-submitted notice of change of address, and the agency consequently mails the suspension notice to the broker's former address, or (2) notwithstanding the existence of a current forwarding order on file with the U.S. Postal Service and in effect, the Postal Service nevertheless fails to forward a notice of suspension to a broker's new address. *See generally* A.R. 9; A.R. 11.

[11]In a later, related opinion, the Retamal court addressed the issue of subject matter jurisdiction:

> [T]he statutes "do not address [ ] or confer jurisdiction in cases involving revocation of a broker's license by operation of 19 U.S.C. § 1641(g)(2)(C)". Indeed, the fact that Congress has provided in 19 U.S.C. § 1641(e) for judicial appeal from license revocations pursuant to [other,] preceding subsections of 1641 is the best evidence

At the request of both parties, the Court stayed further proceedings in this action pending the

decision of the U.S. Court of Appeals for the Federal Circuit in Retamal. The Court of Appeals'

opinion in that case issued earlier this year, and is the predicate for Plaintiff's pending Motion to

Transfer.

### III. Analysis

In Retamal, the Court of Appeals has squarely held that the Court of International Trade lacks

subject matter jurisdiction to review the revocation of a customs broker's license for failure to timely

file a triennial status report. Retamal v. U.S. Customs & Border Protection, Dep't of Homeland

Security, 439 F.3d 1372, 1375-76 (Fed. Cir. 2006). Plaintiff contends that this action therefore

should be transferred to the U.S. District Court for the District of Massachusetts, pursuant to 28

U.S.C. § 1631.

The statute invoked by Plaintiff provides, in pertinent part:

§ 1631. Transfer to cure want of jurisdiction

Whenever a civil action is filed in a court . . . and that court finds that there is a
want of jurisdiction, the court shall, *if it is in the interest of justice*, transfer such
action . . . to any other such *court in which the action . . . could have been brought*
at the time it was filed . . . , and the action . . . shall proceed as if it had been filed in
. . . the court to which it is transferred on the date upon which it was actually filed in
. . . the court from which it is transferred.

---

of the legislative determination not to permit such review of matters arising out of
succeeding subsection (g), nor does the history of those statutes . . . show otherwise.

Retamal v. U.S. Customs & Border Protection, Dep't of Homeland Security, 29 CIT ____, ____,
2005 WL 280440 at * 4 (2005) (*quoting* Plaintiff's Motion for Rehearing) (footnote omitted),
*vacated in part and rev'd in part*, 439 F.3d 1372 (Fed. Cir. 2006).

28 U.S.C. § 1631 (emphasis added).[12]   Accordingly, because it is plain that this Court lacks jurisdiction over the instant action, transfer pursuant to § 1631 is warranted if (a) transfer is "in the interest of justice," and (b) the action "could have been brought" in the U.S. District Court for the District of Massachusetts.  *See generally* Britell v. United States, 318 F.3d 70, 73-74 (1ˢᵗ Cir. 2003) (highlighting history of § 1631, summarizing purpose of statute as "protect[ing] litigants against both statutory imprecision and lawyers' errors," and explaining that statute creates rebuttable presumption in favor of transfer); Dalton v. Southwest Marine, Inc., 120 F.3d 1249, 1250 (Fed. Cir. 1997) ("section 1631 is a remedial statute designed to eliminate any prejudice that results from filing in an improper forum") (citation omitted).

---

[12]Although "[t]he primary application of [§ 1631] is to correct errors made by plaintiffs or appellants in bringing an action or appeal in a district court or court of appeals rather than in one of the specialized courts" such as the U.S. Court of International Trade, the statute "may also be applied to transfer a case from one of those specialized courts to an appropriate regional district court or court of appeals."  James Wm. Moore, Moore's Federal Practice, Judicial Code ¶ 1631.2 (3d ed. 2006) (cataloguing cases); *see also* Texas Peanut Farmers v. United States, 409 F.3d 1370, 1374-75 (Fed. Cir. 2005).  That is the situation presented here.

The Courts of Appeals disagree as to whether § 1631 authorizes the transfer of individual claims, or only the transfer of an entire action.  *See* 17 James Wm. Moore *et al.*, Moore's Federal Practice § 111.51[2] (3d ed. 1999).  Similarly, there is a split in the circuits as to whether actions may be transferred under § 1631 to cure defects other than subject matter jurisdiction (such as a lack of personal jurisdiction over the defendant, or improper venue).  *See id.* § 111.51[1],[3]; Moore's Federal Practice, Judicial Code ¶ 1631.2.  However, neither controversy is relevant here.

A.  Whether Transfer Is In The Interest of Justice

The Government apparently does not dispute Plaintiff's claim that transfer would serve the interest of justice.[13]  As a leading treatise explains, "The 'interest of justice' requirement ordinarily will be satisfied if the statute of limitations has expired subsequent to the time of the original filing, so that transfer, rather than dismissal, will preserve the plaintiff's cause of action."  17 Moore's Federal Practice § 111.52 (footnote omitted).  Indeed, "[e]ven if the statute of limitations would not bar the plaintiff from refiling the action in the correct court, transfer rather than dismissal may be in the interest of justice because it would save the plaintiff the time, expense and effort of having to refile the action."  *Id.* (footnote omitted).

Transfer is thus the preferred course of action in a case such as this, unless (1) the action is patently frivolous, (2) the action was not timely filed in the original court, or (3) the movant was dilatory in seeking transfer.  Moore's Federal Practice, Judicial Code ¶ 1631.2.  Moreover, "[s]ince the term 'interests of justice' is vague," a court is entitled to "a good deal of discretion" in reaching its determination.  Phillips v. Seiter, 173 F.3d 609, 610 (7th Cir. 1999) (Posner) (citations omitted).

---

[13]*See* Defendant's Brief at 2 (arguing only that Plaintiff "has failed to show that this action could have been brought in the district court").

Notably, the Government makes no claim that it would suffer prejudice as a result of the requested transfer. *Compare* Brittel, 318 F.3d at 74 (transfer contraindicated where it would "impose an unwarranted hardship on an objector" or "unfairly benefit the proponent") (citations omitted); Narragansett Elec. Co. v. U.S. Environmental Protection Agency, 407 F.3d 1, 8 (1st Cir. 2005) (transfer appropriate where there is "no argument that [a party] will be harmed by the transfer"); Texas Peanut Farmers, 409 F.3d at 1375 (transfer appropriate where "the government cannot logically show that it will be harmed by transfer").

The Court of Appeals' opinion in <u>Retamal</u> was handed down on March 6, 2006.  *See* <u>Retamal</u>, 439 F.3d 1372.  The Government and the Court were on notice of Plaintiff's intent to seek to transfer this action less than a month thereafter.  *See* Joint Status Report (April 5, 2006).  And the Motion to Transfer itself was filed on May 8, 2006 – mere days after the Court of Appeals' mandate in <u>Retamal</u> issued.  In short, there can be no argument here that Plaintiff was slow to seek the relief in question.

Analysis of the two remaining prongs is somewhat less definitive.  However, because it is not yet clear which statute of limitations applies, it cannot be said that this action was not timely filed.[14]  Certainly the Government has advanced no such argument here.[15]  *See generally* <u>Pentax</u>

---

[14]As discussed in greater detail below, Plaintiff appears to raise several different claims, including (at a minimum) a challenge to the revocation of his personal broker's license, and also – more generally – a challenge to the validity of Customs' regulation.  And different claims may be subject to different statutes of limitation.

*See*, *e.g.*, 28 U.S.C. § 2401(a) (with exceptions not relevant here, "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues"); <u>Trafalgar Capital Associates, Inc. v. Cuomo</u>, 159 F.3d 21, 34 (1st Cir. 1998) (standard statute of limitations for actions under Administrative Procedure Act ("APA") is six years, as set forth in 28 U.S.C. § 2401(a)) (citations omitted).

[15]In its Answer, the Government asserts that "[t]he Court lacks subject matter jurisdiction . . . because the Summons and Complaint in this action were filed after the 60-day period provided by 19 U.S.C. 1641(g) and 19 C.F.R. 111.30 had expired."  Answer ¶ 38.  However, neither of those provisions constitutes a statute of limitations.

Indeed, based on its appellate brief in <u>Retamal</u>, it appears that the Government may be taking the position that broker's license revocations of the type at issue here are entirely immune from judicial review in any forum.  *See*, *e.g.*, Brief for Appellee, United States Customs and Border Protection, Department of Homeland Security (July 26, 2005) at 15, <u>Retamal v. U.S. Customs and Border Protection, Dep't of Homeland Security</u>, 439 F.3d 1372 (Fed. Cir. 2006) (No. 05-1332) ("Gov't Brief in <u>Retamal</u>") ("For this type of revocation, arising from a failure to timely file a triennial status report, Congress provided a distinct administrative remedy but *did not provide for*

Corp. v. Myhra, 72 F.3d 708, 711 (9th Cir. 1995) (declining to express an opinion on, *inter alia*, "the

statute of limitations issue," court nevertheless concluded that "the prudent thing to do is to direct

the district court to transfer the case to the CIT") (subsequent history omitted).

  Similarly, in the apparent absence of any precedent on point, the instant action cannot fairly

be deemed "frivolous."[16]  Plaintiff's argument that 19 C.F.R. § 111.30(d)'s "60-day clock" is

---

*judicial review of such a revocation. . . . [I]f Congress had intended for judicial review* of a
revocation under 19 U.S.C. § 1641(g)(2)(C), it would have provided for such review within Section
1641(e) or (g) and within 28 U.S.C. § 1581(g).") (emphases added); *see generally id*. at 14-16, 21
(same).  *Cf*. Retamal, 29 CIT at ____, 2005 WL 280440 at * 4 (*quoting* Plaintiff's Motion for
Rehearing), *vacated in part and rev'd in part*, 439 F.3d 1372.

  Obviously, if the Government contends that judicial review of such revocations is not
available, it logically follows that the Government believes that there is no relevant statute of
limitations to apply.  It is true that the Government's brief on appeal in Retamal included an
argument that the 60-day statute of limitations reflected in 19 U.S.C. § 1641(e)(1) and 28 U.S.C. §
2636(g) barred prosecution of that action.  However, the Government there was plainly arguing in
the alternative.  *See* Gov't Brief in Retamal at 29-30 ("Assuming, *arguendo*, . . .").  As the
Government repeatedly emphasized elsewhere in that brief, the license revocations addressed in 19
U.S.C. § 1641(e)(1) and 28 U.S.C. § 2636(g) do not include revocations for failure to file a triennial
status report.  *See*, *e.g.*, Gov't Brief in Retamal at 9, 13-16, 34.

  [16]Although Plaintiff's Motion to Transfer is predicated on a lack of subject matter
jurisdiction, § 1631 confers on the Court jurisdiction to engage in a limited review of the merits of
Plaintiff's case, to ensure that the proposed transfer would not simply waste the district court's time.
*See* 17 Moore's Federal Practice **§** 111.52 (*citing* Phillips v. Seiter, 173 F.3d at 610-11).

  "Thus, even though transfer is the option of choice, an inquiring court must undertake case-
specific scrutiny to ferret out instances in which the administration of justice would be better served
by dismissal. . . . Given the language of the statute, [it seems clear] that Congress wanted courts to
exempt from the transfer mandate those cases in which transfer would unfairly benefit the proponent,
. . . impose an unwarranted hardship on an objector, . . . or unduly burden the judicial system . . ..
In conducting its inquiry into the presence or absence of such factors, a putative transferor court must
consider the totality of the circumstances." Britell, 318 F.3d at 74 (citations omitted).  "Among other
things, this responsibility obligates the court to engage in whole-record review." *Id*.  In short, in
considering whether to transfer an action under § 1631, "the court can take a peek at the merits" of
the case, "since whether or not the suit has any possible merit bears significantly on whether the

fundamentally inconsistent with the plain language of the statute at 19 U.S.C. § 1641(g)(2)(B) is no

mere trifle.[17]  *See* A.R. 11 (June 5, 2003 letter to Customs from counsel for Plaintiff, emphasizing

"the difference in language between the statute and the regulation").[18]  Moreover, Plaintiff cloaks

his claims in the U.S. Constitution, characterizing his customs broker's license as a "property right,"

and asserting that the circumstances of the agency's revocation of that license constituted a

deprivation of "due process."  Plaintiff's Brief at 4, 6-7.[19]  Plaintiff maintains that, if jurisdiction over

---

court should transfer or dismiss it."  Phillips v. Seiter, 173 F.3d at 610-11; *see also* Aura Lamp & Lighting, Inc. v. Int'l Trading Corp., 325 F.3d 903, 907 (7th Cir. 2003) (same).

[17]Plaintiff's position is buttressed by the language Congress used elsewhere in the statutory scheme.  *See, e.g.*, 28 U.S.C. § 2636(a)(1) (civil action contesting Customs' denial of protest is barred unless commenced within 180 days "after the date of mailing" of Customs' notice of denial). Clearly, if Congress had intended to require customs brokers to file their triennial reports within 60 days of the *date of mailing* of the notice of suspension – rather than the *date of receipt* of the notice – it could have so specified.  *See generally* McNary v. Haitian Refugee Center, Inc., 498 U.S. 479, 494 (1991) (rejecting agency's interpretation of statutory language, reasoning that – had Congress intended a broader preclusion (as the agency asserts that Congress did) – Congress "could easily have used broader statutory language," and "could, for example, have modeled [the statutory provision in question] on the more expansive language" that Congress used elsewhere in the same statutory scheme).  *But see* Gov't Brief in Retamal at 23-26 (arguing "that 'the date of the notice' language in 19 C.F.R. § 111.30(d)(4) is necessary to carry out the provisions of 19 U.S.C. § 1641(g)").

[18]Unlike Plaintiff here, the plaintiff in Retamal did not attack the validity of Customs' regulation before the Court of International Trade in his Complaint or his initial brief, and raised the issue for the first time only when he (unsuccessfully) sought rehearing.  Although he sought to press the point on appeal, the Court of Appeals did not reach the issue.  *See* Gov't Brief in Retamal at 23 *et seq.* (responding to plaintiff's argument that regulation is inconsistent with language of statute).

[19]In Retamal, the Government asserted that "the possession of a broker's license does not rise to the level of a protected property interest."  *See* Gov't Brief in Retamal at 22 (*citing* Pietrofeso v. United States, 16 CIT 751, 755, 801 F. Supp. 743, 747 (1992)).  But Pietrofeso is inapposite.  The Government's argument overlooks the critical distinction between the *granting* of a license and the *retention* of a license that has previously been granted.

As the Supreme Court has observed:

> Once licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without . . . procedural due process.

Bell v. Burson, 402 U.S. 535, 539 (1971). *See also* 3883 Connecticut LLC v. District of Columbia, 336 F.3d 1068, 1072 (D.C. Cir. 2003) (emphasizing the "critical distinction" between cases where "the question was whether an *applicant* for a permit had a property interest" in the permit and the case there at bar, which concerned "whether the *holder* of a permit has a property interest therein"); Goldsmith v. U.S. Board of Tax Appeals, 270 U.S. 117, 123 (1926) (lawyer/applicant who was refused admission to practice before Board of Tax Appeals had property interest and claim to practice before the Board to which procedural due process requirements applied, notwithstanding Board rule providing that it could in its discretion deny admission to any applicant, or suspend or disbar any person after admission; Board's discretionary power "must be construed to mean the exercise of a discretion to be exercised after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process"), *cited with approval in* Board of Regents of State Colleges v. Roth, 408 U.S. 564, 576 n.15 (1972).

Moreover, "[d]ue process requires that when a State seeks to terminate [a protected property interest], it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective." Bell v. Burson, 402 U.S. at 542 (citations omitted); Board of Regents, 408 U.S. at 569-70 ("When protected interests are implicated, the right to some kind of prior hearing is paramount."). In Retamal, the Government argued that the suspension/revocation procedures here at issue afford brokers a "fair opportunity to be heard 'at a meaningful time and in a meaningful manner' throughout the process," and that "due process does not require that the interested party actually receive the notice." *See* Gov't Brief in Retamal at 21-23, 26-28.

The Court of Appeals did not reach the parties' due process arguments in Retamal. However, in evaluating the adequacy of due process afforded a licensee, a court is to consider:

> first, the private interests that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

his case does not lie in the Court of International Trade, "jurisdiction must lie elsewhere or the plaintiff will have no rights or remedies."[20]  Plaintiff's Brief at 6.[21]

Plaintiff's case thus is not, on its face, "clearly doomed" – a "sure loser," surviving only "on life support," with "no chance of success."  *Compare* Phillips v. Seiter, 173 F.3d at 610-11 ("there is no reason to raise false hopes and waste judicial resources by transferring a case that is clearly doomed"; an action should be dismissed, rather than transferred, if it is a "sure loser"); Britell, 318 F.3d at 75 ("if an action . . . is fanciful or frivolous, it is in the interest of justice to dismiss it rather than to keep it on life support (with the inevitable result that the transferee court will pull the plug)"); Aura Lamp & Lighting, 325 F.3d at 907-10 (when appellant had no chance of success on appeal, transfer would not serve interest of justice, and dismissal was warranted instead).  To the contrary, Plaintiff's claims are at least colorable, and present certain novel issues of law.

The transfer statute at issue – § 1631 – reflects "the salutary policy [inherent in federal law] favoring the resolution of cases on the merits."  Britell, 318 F.3d at 74 (citations omitted).  "Put another way, transfer is presumptively preferable because the dismissal of an action . . . that might

---

3883 Connecticut LLC , 336 F.3d at 1074 (*quoting* Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). And, "[w]hile the problem of additional expense [associated with proposed additional or substitute procedural safeguards] must be kept in mind, it does not justify denying a hearing meeting the ordinary standards of due process."  Bell v. Burson, 402 U.S. at 540-41 (*quoting* Goldberg v. Kelly, 397 U.S. 254, 261 (1970)).

[20]The hoary maxim on which Plaintiff relies can be traced to Blackstone:  "[I]t is a general and indisputable rule, that *where there is a legal right*, *there is also a legal remedy*, by suit or action at law, whenever that right is invaded." William Blackstone, 3 Commentaries *23 (emphasis added) (*cited in*, *inter alia*, Marbury v. Madison, 5 U.S. 137, 163 (1803)).

[21]*But see* Gov't Brief in Retamal at 14-16, 21 (arguing that revocations of brokers' licenses for failure to file triennial status reports are not subject to judicial review in any forum).

thrive elsewhere is not only resource-wasting but also justice-defeating." *Id*. (citation omitted).

Accordingly, where – as here – a case has at least *some* chance of success on the merits in some other

federal court, transfer (rather than dismissal) is the required course of action. *See* Moore's Federal

Practice, Judicial Code ¶ 1631.2 (*citing* In re Apex Oil Co., 884 F.2d 343, 346 (8th Cir. 1989)).[22]

### B. Whether The Action Could Have Been Brought in District Court

Even where it would serve the interest of justice, transfer under 28 U.S.C. § 1631 is not

permitted if the court to which the action would be transferred is not one in which the action "could

have been brought at the time it was filed." 28 U.S.C. § 1631. According to a leading treatise, that

phrase has been interpreted to mean that – at the time the action was filed in the original court – "the

transferee court would have had (1) subject matter jurisdiction, (2) proper venue, and (3) personal

jurisdiction over the defendant." 17 Moore's Federal Practice § 111.53 (footnotes omitted).

The Government contends that Plaintiff here "has failed to show that this action could have

been brought in the district court." Defendant's Brief at 2. Although it is not expressly stated, it

appears that the Government's challenge is limited solely to subject matter jurisdiction (and does not

extend to venue or personal jurisdiction). *See* Defendant's Brief at 2-3 (arguing only in terms of

"jurisdiction"). Moreover, the Government has not challenged the substantive merits of Plaintiff's

assertion that jurisdiction lies in the District Court in Massachusetts. Nor is the Government

---

[22]*See also* Britell, 318 F.3d at 75-76 (noting the difficulty of the issue presented – "a matter over which reasonable jurists could disagree," and emphasizing that a decision on the merits of that case "[might] well prove important from the standpoint of public policy," which the court viewed as "a significant factor in the decisional calculus"). Similar considerations are present in the case at bar, and – as in Britell – weigh decisively in favor of transfer.

claiming that jurisdiction properly lies in some other court. *See* Narragansett Elec. Co., 407 F.3d at 8 (transfer appropriate where opposing party "made no argument that it . . . would prefer a different forum for any reason"). Rather, the Government here emphasizes only that, as a matter of procedure, "the plaintiff bears the burden of proving the soundness of its jurisdictional allegations" – a burden that the Government alleges Plaintiff has failed to meet. Defendant's Brief at 2-3 (arguing that Plaintiff's assertions, "without more, are insufficient to meet the plaintiff's burden of showing that jurisdiction resides in the district court").

The Government charges that Plaintiff "does little more than merely assert that if this Court does not have jurisdiction to entertain the action then 'jurisdiction thus would lie with the Federal District Court,' and 'jurisdiction must be in the Federal District Court in Boston.'" Defendant's Brief at 3 (*quoting* Plaintiff's Brief at 4, 8). But the Government overlooks Plaintiff's invocation of the District Court's general "federal question" jurisdiction under 28 U.S.C. § 1331. *See* Plaintiff's Brief at 5 ("interpretation of [the statutory language] 'receipt of the Secretary's notice' is a federal question"; "interpretation of the language of the statute is a federal question"), 7; McNary, 498 U.S. 479 ("general collateral challenges to unconstitutional practices and policies used by . . . agency in processing applications" reviewable under district court's general "federal question" jurisdiction).

Moreover, under the circumstances, it is entirely unclear what more Plaintiff can reasonably be expected to say. These are largely uncharted waters. What little judicial precedent there is on broker's license revocations of this type simply does not speak to where jurisdiction to review such a revocation might lie. It holds only that jurisdiction does not lie in the Court of International Trade. *See* Retamal, 439 F.3d at 1375-76.

As discussed above, the Government argued in <u>Retamal</u> that broker's license revocations of the type at issue here are not judicially reviewable in any forum. *See generally* n.15, *supra* (discussing Government's argument to Court of Appeals in <u>Retamal</u> that brokers' license revocations for failure to file triennial status reports are not subject to judicial review). But, if the Government plans to advance that argument here, it has not done so yet. And, in any event, the Government's argument is by no means open-and-shut.[23]

---

[23]In <u>Retamal</u>, the Government argued that there is no need for judicial review of license revocations for failure to file a triennial report in light of the availability of a "distinct administrative remedy" prescribed by Congress. *See* Gov't Brief in <u>Retamal</u> at 15-16 (referring to the "distinct administrative remedy . . . set forth in 19 U.S.C. § 1641(g)(2)(A), (B) and (C)"); *id*. at 10, 21-23, 32. But the Government's interpretation of at least one aspect of that "administrative remedy" would render it largely illusory in cases such as this.

Specifically, in <u>Retamal</u>, the Government sought to minimize the significance of the notice of suspension required by 19 U.S.C. § 1641(g)(2)(A). *See generally* Gov't Brief in <u>Retamal</u> at 26-28. To that end, the Government first stressed that the notice "is not intended to remind the broker of his statutory obligation to file the report, but rather is issued only after the broker has failed to meet his statutory obligations." *Id*. at 27. The Government pointed out that all brokers must pass a licensing examination demonstrating knowledge of customs laws, regulations, and procedures. *Id*. at 28. The Government emphasized that the same statutory and regulatory scheme "puts all brokers on actual notice that they are required to file triennial reports." *Id*. at 27-28. And the Government noted that, indeed, the plaintiff in <u>Retamal</u> had timely filed several triennial status reports in the past (as had Plaintiff here), evidencing personal knowledge of the filing requirement. *Id*. at 28; A.R. 2-5 (Plaintiff's triennial status reports filed in 1991, 1994, 1997, and 2000).

Distilled to its essence, the Government's argument seems to be that brokers should be aware of their obligation to file triennial status reports and thus should not be heard to complain of a lack of notice. Whatever the logical and practical appeal of the Government's argument, the fact remains that Congress obviously envisioned that some licensed brokers would fail to timely file their triennial reports, and – in its wisdom – required Customs to give all such brokers (not just first time filers) notice of their suspension and an opportunity to cure. Nothing that the Government has cited (here or in <u>Retamal</u>) suggests that Customs is free to "second-guess" Congress under circumstances such as these.

_____

The Government also argued in <u>Retamal</u> that Customs' regulation (which provides that the 60-day "grace period" runs from "the date of notice of suspension") is not incompatible with the statute (which provides that the "grace period" runs from "receipt" of that notice). *See* Gov't Brief in <u>Retamal</u> at 23-26. Invoking <u>Chevron</u> and <u>Mead</u>, the Government asserted that Customs' regulation was entitled to deference as an interpretation of the statute:

> If Congress has not directly addressed the precise question at issue, the Court must not impose its own construction on the statute. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the Court is simply whether the agency's interpretation is based on a permissible construction of the statute.

Gov't Brief in <u>Retamal</u> at 24 (emphasis added) (*citing* <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 844 (1984), *and* <u>United States v. Mead Corp.</u>, 533 U.S. 218, 226-27 (2001)). However, the Government failed to explain how – by using the language "receipt" – Congress "has not directly addressed the precise question at issue." Nor did the Government explain how the term "receipt" can be deemed "ambiguous." Certainly the Government proffered no authority for equating the date of dispatch of notice (the date specified in the regulation) with the date of "receipt" (the date specified in the statute). *Compare* Gov't Brief in <u>Retamal</u> at 26 (arguing that regulation's use of date of dispatch of notice merely "fills a gap or defines a term [*i.e.*, "receipt"] in a way that is reasonable").

In effect, Customs' regulation seems to rewrite the statute, by treating the words "of receipt" as mere surplusage and reading them right out of the statute. But the statute expressly provides that a broker may avoid the revocation of his license by filing his status report "within 60 days *of receipt* of the Secretary's notice [of suspension]" – *not* "within 60 days of the Secretary's notice," as Customs seems to suggest. *See* 19 U.S.C. § 1641(g)(2) (emphasis added). To date, the Government has failed to reconcile Customs' interpretation of the statute with the venerable canon of statutory construction which holds that "effect must be given, if possible, to every word, clause and sentence of a statute." 2A Norman J. Singer, Sutherland on Statutes and Statutory Construction § 46:06 (6ᵗʰ ed. 2000) (*citing*, *inter alia*, <u>United States v. Menasche</u>, 348 U.S. 528, 538-39 (1955); <u>Texas State Comm'n for the Blind v. United States</u>, 796 F.2d 400, 419 (Fed. Cir. 1986) ("Basic principles of statutory construction require that effect should be given to every word of the statute so that no part will be rendered meaningless.") (citations omitted)). "[L]egislative enactments should not be construed to render their provisions mere surplusage." <u>Dunn v. Commodity Futures Trading Comm'n</u>, 519 U.S. 465, 472 (1997); *see also* 2A Sutherland on Statutes and Statutory Construction § 46:07 (legislature "is presumed to have intended to avoid surplusage in the words and sentences" chosen in drafting statute).

The Government sought to justify Customs' regulation in Retamal by claiming that hewing to the plain meaning of the statute would yield absurd results, and that the regulation is therefore "necessary to effect Congressional intent":

> [I]f [the statute] were construed to require actual receipt of Customs' notice, it is clear that . . . a broker's license could never be revoked if the broker failed timely to submit the triennial report, *never sent Customs a change of address*, and Customs itself never fortuitously learned of the address change. . . . Congress obviously did not anticipate a situation where actual receipt of notice could be made impossible because of an inadvertent or intentional failure of the broker to provide Customs with an updated mailing address.

Gov't Brief in Retamal at 23, 26 (emphasis added). However, it is far from clear that the so-called "absurdity doctrine" may be invoked here, given the plain meaning of the statute. "The doctrine has no application where a statute is clear." Peabody Coal Co. v. Navajo Nation, 75 F.3d 457 (9th Cir. 1996). As the Supreme Court emphasized in the seminal case on point:

> Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly and intentionally provided. . . . It is not [the courts'] assigned role to alter that disposition.

Commissioner of Internal Revenue v. Asphalt Prods. Co., 482 U.S. 117, 121 (1987). *See also* Crooks v. Harrelson, 282 U.S. 55, 60 (1930) ("It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. . . . [I]*n such case the remedy lies with the lawmaking authority*, *and not with the courts*.") (emphasis added) (citations omitted). In sum, it is settled law that – as a general principle – when a statute is unambiguous, there is no room for the courts (or the agency) to re-write it, even to avoid arguably absurd results. Thus, Plaintiff here can make a strong case that, if Customs believes that the statute as written is impracticable, its remedy lies with Congress.

Moreover, even if the language of the statute could yield absurd results in certain situations (as the Government claims), it appears that *Customs' regulation* has the potential to produce absurd results as well. The Government's concern is that, if actual receipt of a notice of suspension is required, a broker may evade revocation of his license simply by failing to provide Customs with a change of address. In other words, the Government is concerned that – under a "receipt-based" scheme – brokers have no real incentive to ensure that Customs has their current addresses on file. But it is arguably no less perverse to have a "dispatch-based" scheme where Customs has no particular incentive to ensure that its database of brokers' addresses is 100% up-to-date and accurate, and that all address labels on suspension notices are completely free of typographical errors.

In Retamal, the Government sought to make much of the fact that the statute expressly provides for judicial review of license revocations in certain situations, but makes no mention of revocations for failure to file triennial status reports. *See* Gov't Brief in Retamal at 14-16, 21. But the Government may be reading too much into that silence. Specifically, "[t]he mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review." Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670 (1986) (*quoting* legislative history of Administrative Procedure Act).[24] There is a "strong presumption that Congress intends

_____

In the case at bar, for example, Plaintiff maintains that, in fact, he *did* submit a change of address to Customs, but that the agency failed to update its database (and thus sent his notice of suspension to the wrong address). *See* Complaint ¶¶ 3-5; A.R. 9 (May 13, 2003 letter to Customs from counsel for Plaintiff). From Plaintiff's perspective, an error on the part of some anonymous clerical worker at Customs has cost Plaintiff his license and his livelihood.

In short, as the Government has suggested in Retamal, the statute may not have envisioned the situation where a broker fails to submit a change of address, in violation of the law. But, in attempting to address that scenario (by substituting *dispatch* of notice for "receipt" of notice), Customs has apparently failed to contemplate certain other scenarios such as that presented here – where the agency has failed to properly record a change of address. *See generally* n.10, *supra*. According to Plaintiff, in circumstances such as these – where the broker has been deprived of notice through no fault of his own – it would be absurd and inconsistent with the language of the statute to revoke the broker's license.

Finally, the Government's brief in Retamal sought to make much of the fact that a broker whose license is revoked for failure to file a triennial report remains free to apply for a new license "without prejudice." *See*, *e.g.*, Gov't Brief in Retamal at 15-16, 22; 19 U.S.C. § 1641(g)(2)(C). But that is small comfort to Plaintiff here – an option akin to taking the bar exam again, a prospect that no experienced lawyer would relish. *See* Plaintiff's Brief at 7 (noting that "Customs requires a passing grade on a rigorous examination, a background investigation and adherence to regulations"); Dunn-Heiser v. United States, 29 CIT ____, ____ n.7, 374 F. Supp. 2d 1276, 1278 n.7 (2005) (discussing pass rates for customs broker licensing exams in various years, ranging from low of 3% to high of 50%).

[24]*But see* Retamal, 29 CIT at ____, 2005 WL 280440 at * 4, *vacated in part and rev'd in part on other grounds*, 439 F.3d 1372 ("[T]he fact that Congress has provided in 19 U.S.C. § 1641(e) for

judicial review of administrative action." Bowen, 476 U.S. at 670; Wright & Koch, Federal Practice

and Procedure: Judicial Review, § 8390 (2006) ("there is a strong presumption against [judicial]

unreviewability"). Thus, "judicial review of . . . administrative action is the rule, and

nonreviewability an exception which must be demonstrated." Bowen, 476 U.S. at 671 n.3 (*quoting*

Barlow v. Collins, 397 U.S. 159, 166-67 (1970)).

Much as it argued in Retamal, the Government in Bowen contended that a statute which

expressly authorized judicial review of "any determination . . . as to . . . the amount of benefits under

[Medicare] part A" implicitly – by its silence – foreclosed judicial review of all questions affecting

the amount of benefits payable under Part B of the Medicare program. But the Supreme Court made

short work of the Government's position. The Court unanimously held that, contrary to the

Government's claim, the statute there at issue was "on its face . . . an explicit *authorization* of

judicial review, not a *bar*." Bowen, 476 U.S. at 674 (emphasis added) (footnote omitted). The Court

further emphasized that, "As a general matter, '"[t]he mere fact that some acts are made reviewable

should not suffice to support an implication of exclusion as to others. The right to review is too

important to be excluded on such slender and indeterminate evidence of legislative intent."'"

Bowen, 476 U.S. at 674 (*quoting* Abbott Laboratories v. Gardner, 387 U.S. 136, 141 (1967), which

in turn quotes L. Jaffee, Judicial Control of Administrative Action 357 (1965)). In short, as a

threshold matter, whether Congress intended to preclude judicial review of broker's license

---

judicial appeal from license revocations pursuant to preceding subsections of 1641 is the best
evidence of the legislative determination not to permit such review of matters arising out of
succeeding subsection (g)").

revocations such as the one at issue here is not as clear cut as the Government has elsewhere suggested.

Further, even assuming – *arguendo* – that Congress intended to shield these types of revocations from judicial review (which Plaintiff vigorously denies), Plaintiff's action is more than merely a garden variety challenge to the revocation of his own license. Plaintiff also challenges the validity of Customs' regulation (which, Plaintiff contends, is fundamentally inconsistent with the plain language of the statute). *See*, *e.g.*, A.R. 11 (June 5, 2003 letter to Customs from counsel for Plaintiff) (highlighting "the difference in language between the statute and the regulation"); A.R. 9 (May 13, 2003 letter to Customs from counsel for Plaintiff); Complaint ¶¶ 12, 20, 22 (relying on language of statute, as contrasted with regulation invoked by Customs in revoking Plaintiff's license; asserting that "[a]ccording to the statute, the plaintiff is entitled to receive notice of suspension of license prior to revocation"). *Compare* 19 U.S.C. § 1641(g)(2)(B) (suspended license to be reinstated if triennial status report is filed "within 60 days of receipt of the Secretary's notice [of suspension]") *with* 19 C.F.R. § 111.30(d)(4) (suspended license to be reinstated if triennial status report is filed "within 60 calendar days of the date of the notice of suspension").[25]

---

[25]The difference between the language of the statute and Customs' regulation is an issue not only for brokers who never receive notice of their suspension, like Plaintiff here. The difference is significant for *any* broker whose license is suspended, because it affects the actual duration of the "grace period" during which a broker may avoid the revocation of his license by filing his triennial status report.

In other words, by changing the date that triggers the 60-day "grace period" from the day of a broker's "receipt" of a notice of suspension (as provided in the statute) to "the date of the notice" itself, Customs effectively *shortens* the 60-day statutory "grace period" by the number of days between dispatch of the notice and receipt of notice. *Compare* 19 U.S.C. § 1641(g)(2) *and* 19 C.F.R. § 111.30(d)(4). This is yet another way in which Customs' implementation of the scheme arguably

Bowen is instructive on this point as well. In Bowen, the plaintiff physicians filed suit to challenge the validity of a regulation promulgated under Part B of the Medicare Program that authorized the payment of benefits in different amounts for similar physicians' services. As discussed above, the Supreme Court held that the statutory provisions that authorize judicial review of determinations as to the amount of benefits under Medicare Part A do not implicitly foreclose judicial review of agency regulations implementing Part B.

The Court emphasized that the statutory scheme at issue in Bowen "simply does not speak to challenges mounted against the *method* by which . . . [benefit] amounts are to be determined rather than the [individual benefit] *determinations* themselves." Bowen, 476 U.S. at 675-76. The Court reasoned that "an attack on the validity of a regulation is not the kind of administrative action . . . which decides 'the amount of the Medicare payment to be made on a particular claim' and with respect to which the Act impliedly denies judicial review." Bowen, 476 U.S. at 675-76. The Court therefore concluded that "Congress intended to bar judicial review only of determinations of the amount of benefits to be awarded under [Medicare] Part B. . . . [Other matters] – including *challenges to the validity of the Secretary's instructions and regulations* – are not impliedly insulated from judicial review." Bowen, 476 U.S. at 678 (emphasis added). *See generally* McNary, 498 U.S. at 497-98 (discussing Bowen).

Bowen teaches that it may be important to distinguish between the reviewability of individual determinations on the one hand, and challenges to agency regulations and methodology on the other.

---

deviates from Congress' intent (as manifest in the language of the statute) – and one which presumably affects a far greater number of brokers.

Even if Congress intended to preclude judicial review of *individual license revocations* such as the one at issue here (as the Government has claimed), nothing cited by the Government in Retamal (or here) suggests that Congress intended *Customs' regulations* to be immune from judicial review.[26]

Plaintiff's constitutional claims are the cherry on top. As outlined above, there is a powerful presumption favoring judicial review of agency action, which may be overcome only where the Government makes "a showing of 'clear and convincing evidence' of a contrary legislative intent." Bowen, 476 U.S. at 671 (*quoting* Abbott Laboratories v. Gardner, 387 U.S. at 141). When a case involves a colorable constitutional claim, however, the Government's hurdle becomes – as a practical matter – virtually insurmountable. The leading treatise on administrative law explains:

> The [Supreme] Court has always distinguished between judicial review of an agency action based on alleged violation of a statute and judicial review of an agency action based on a credible claim that the action violates the petitioner's constitutional rights. . . . *[T]he Court continues to be extraordinarily protective of a petitioner's ability to obtain judicial consideration of a credible claim that an agency action violates the petitioner's constitutional rights.* It decides cases in this area under the shadow of a difficult and unresolved issue of constitutional law. Even though Congress has the power to specify the jurisdiction of federal courts, it is at least arguable that Congress cannot preclude a federal court from resolving disputes concerning the constitutional validity of government actions. . . . *The Court has consistently avoided the need to resolve this question by interpreting statutes in a manner that permits judicial review of credible claims that an agency action violates a petitioner's constitutional rights.*
>
> *The presumption of reviewability of agency action reaches its apogee when a statutory preclusion provision threatens to deprive a petitioner of the ability to obtain judicial consideration of a credible claim that the agency action violates the petitioner's constitutional rights. The Court has never interpreted a statute to have this effect.* Taken as a whole, the Court's decisions in this area seem to send a

---

[26]The Government made no such argument in Retamal. Indeed, one section of the Government's brief in that case was devoted to a defense of Customs' regulation, which suggests that the Government concedes that the validity of the regulation is subject to judicial review. *See* Gov't Brief in Retamal at 23-26.

message to Congress: "We do not seek a constitutional confrontation on the question of the power of the courts to resolve disputes concerning the constitutionality of your actions or of the actions you have authorized agencies to take. We will interpret your enactments in a manner that avoids such a confrontation if we possibly can.["]

III Richard J. Pierce, Jr., Administrative Law Treatise § 17.9 (4th ed. 2002) (emphases added).[27]

Ultimately, the Government may or may not prevail on an argument that the U.S. District Court for the District of Massachusetts lacks subject matter jurisdiction in this action. But to prevail on such an argument, the Government must first actually make that argument; and the argument must address the full scope of Plaintiff's claims. *See generally* Wright & Koch, Federal Practice and Procedure: Judicial Review §§ 8390, 8391 ("[judicial] review is rarely precluded for an entire administrative decision and, in most cases, only one of the bundle of issues supporting the decision

---

[27]In <u>Bowen</u>, for example, the Supreme Court emphasized that its holding in that case "avoid[ed] the 'serious constitutional question' that would arise if [it] construed [the statute there at issue] to deny a judicial forum for constitutional claims arising under Part B of the Medicare program." <u>Bowen</u>, 476 U.S. at 681 n.12 (*quoting* <u>Weinberger v. Salfi</u>, 422 U.S. 749, 762 (1975) (additional citations omitted)).

*See also* <u>Webster v. Doe</u>, 486 U.S. 592, 603 (1988) ("where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear" – a "heightened showing" required "in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim"; thus, even where language of the statute committed employment termination decisions solely to discretion of CIA Director, Congress did not "mean[] to preclude consideration of colorable constitutional claims arising out of the actions of the Director pursuant to that section," and "a constitutional claim based on an individual discharge may be reviewed by the District Court") (*quoting* <u>Bowen</u>, 476 U.S. at 681 n.12) (additional citations omitted); <u>McNary</u>, 498 U.S. 479 (provision in Immigration Reform and Control Act of 1986 that expressly prohibited judicial review of most INS denials of special status barred review of *individual denials* only, and thus did not preclude judicial review of "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications"; judicial review permissible in class action alleging that *INS procedures* violated the Act and the due process clause of Constitution); Wright & Koch, Federal Practice and Procedure: Judicial Review § 8391 ("Preclusion [of judicial review] is particularly disfavored when applied to prevent a plaintiff from asserting a constitutional claim.").

may be covered" by preclusion; "In many cases, . . . only some of the controverted issues are unreviewable and the decision is still reviewable as to the remainder of the controverted issues."; "Even if a statute was intended to preclude [judicial] review, . . . that preclusion must be confined to those issues it was intended to cover.").

Particularly under the somewhat unusual circumstances of this case, it seems that the issue of the District Court's subject matter jurisdiction should properly be reserved for decision in the first instance by the District Court itself, rather than debated and resolved in the abstract here. *See generally* United States v. Universal Fruits & Vegetables Corp., 370 F.3d 829, 836-37 & n.13 (9th Cir. 2004) (concluding that – because CIT "*may* be able to hear th[is] case" – "the prudent thing to do is to direct the district court to transfer the case to the CIT *so that the CIT can determine the question of its own jurisdiction*") (citations omitted) (emphases added) (subsequent history omitted); Pentax Corp. v. Myhra, 72 F.3d 708, 711 (9th Cir. 1995) (where it is "not prepared . . . to hold that the CIT would not have had jurisdiction," court concludes that "the prudent thing to do is to direct the district court to transfer the case to the CIT *so that the CIT can determine the question of its own jurisdiction*") (emphasis added) (citation omitted) (subsequent history omitted); Sessler v. United States, 7 F.3d 1449, 1452 (9th Cir. 1993) (Kozinski) (instructing district court to transfer case where there is "another federal court that *may* be able to hear the case") (emphasis added).

## IV.  Conclusion

For all the reasons set forth above, Plaintiff's Motion to Transfer is granted.  The Clerk of the Court is directed to take all necessary steps to effectuate the prompt transfer of this action to the U.S. District Court for the District of Massachusetts.

So ordered.

_____/s/_____
Delissa A. Ridgway
Judge

Decided:  June 30, 2006
            New York, New York

<u>ERRATA</u>

<u>Patrick Butler v. United States of America</u>, Court No. 04-00584, Slip Op. 06-100, dated June 30, 2006.


Page 4:  In the penultimate line of footnote 7, replace "under the circumstances of this case," with "under the circumstances of this case (and through no fault of Plaintiff),".

Page 6:  In the penultimate line of the first paragraph, replace "the date of the notice" with "the alleged date of the notice".

Page 10:  In line three of the second paragraph, replace "Moore's Federal Practice, Judicial Code ¶ 1631.2." with "17 Moore's Federal Practice § 111.52."

Page 11:  In the third line of footnote 14, replace "the validity of Customs' regulation." with "the validity of Customs' regulation.  *See*, *e.g.*, <u>United States v. Larionoff</u>, 431 U.S. 864, 873 & n.12 (1977) ("[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated.")."

In the last line of footnote 14, replace "(citations omitted)." with "(citations omitted); <u>Terran v. Sec'y of Health & Human Services</u>, 195 F.3d 1302, 1311 (Fed. Cir. 1999) ("when a party seeks to challenge a regulation on substantive grounds of invalidity, such as that the regulation was not authorized by legislation, review may still be had" notwithstanding the expiration of a statutory time period for challenging adoption of regulation) (citations omitted); <u>Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Service</u>, 112 F.3d 1283, 1287 (5th Cir. 1997) (Garza) (where agency regulation is alleged to be unconstitutional or inconsistent with statute, regulation may be challenged within six years of its application to plaintiff; "an agency's application of a rule to a party creates a new, six-year cause of action to challenge . . . the agency's constitutional or statutory authority" to adopt that rule); <u>Independent Community Bankers of America v. Board of Governors of Federal Reserve System</u>, 195 F.3d 28, 34 (D.C. Cir. 1999) (distinguishing between "procedural attacks on a rule's adoption" vs. "substantive challenges" to "the application of a regulation"; "a party against whom a rule is applied may, at the time of application, pursue substantive objections to the rule, including claims that an agency lacked the statutory authority to adopt the rule") (citations omitted); <u>Graceba Total Communications, Inc. v. Federal Communications Commission</u>, 115 F.3d 1038, 1040 (D.C. Cir. 1997) (courts "permit both constitutional and statutory challenges to an agency's application or reconsideration of a previously promulgated rule, even if the period for review of the initial rulemaking has expired") (citations omitted); <u>Nat'l Labor Relations Board v. Federal Labor Relations Authority</u>, 834 F.2d 191, 195-96 (D.C. Cir. 1987) (distinguishing between "indirect attacks on the substantive validity of regulations initiated more than sixty days after their promulgation from like attacks on their procedural lineage"; "a petitioner's contention that a regulation should be amended

or rescinded because it *conflicts with the statute* from which its authority derives is reviewable outside of [the] statutory limitations period" that runs from the date of promulgation of the regulation) (citation omitted); <u>Wind River Mining Corp. v. United States</u>, 946 F.2d 710, 716 (9ᵗʰ Cir. 1991) ("a substantive challenge to an agency decision alleging lack of agency authority may be brought within six years of the agency's application of that decision to the specific challenger")."

Page 19:    In the first indented quotation in footnote 23, replace "If Congress has not directly addressed the precise question at issue," with "*If Congress has not directly addressed the precise question at issue*,".

At the end of the first paragraph of footnote 23 on that page – in other words, after the phrase "in a way that is reasonable")." – insert:  "And, as the Supreme Court has emphasized, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress."  <u>Board of Governors of the Federal Reserve System v. Dimension Financial Corp.</u>, 474 U.S. 361, 368 (1986).  *Accord*, <u>Public Employees Retirement System v. Betts</u>, 492 U.S. 158, 171 (1989) ("[N]o deference is due to agency interpretations at odds with the plain language of the statute itself.  Even contemporaneous and longstanding agency interpretations must fall to the extent they conflict with statutory language."), *superseded on other points by statute, as recognized in* <u>General Dynamics Land Systems, Inc. v. Cline</u>, 540 U.S. 581, 594 n.7 (2004)."

Page 20:    At the end of the first paragraph of footnote 23 on that page – in other words, after the phrase "its remedy lies with Congress." – insert:  "*See*, *e.g.*, <u>Board of Governors of the Federal Reserve</u>, 474 U.S. at 374 & n.7 ("The statute may be imperfect, but the [agency] has no power to correct flaws that it perceives in the statute it is empowered to administer.  Its rulemaking power is limited to adopting regulations to carry into effect the will of Congress as expressed in the statute.")."

Page 21:    In line six, replace "476 U.S. 667, 676" with "476 U.S. 667, 671".

Page 23:    In the last line of footnote 25 on that page, replace "implementation of the scheme" with "implementation of the statutory scheme".

July 17, 2006